STATE OF NEBRASKA, EX REL. WILLIAM T. THOMPSON, RELATOR, V. THOMAS J. MAJORS ET AL., RESPONDENTS.

FILED NOVEMBER 15, 1909.   No. 16,167.

1. **Statutes: AMENDMENTS: TITLES OF ACTS.** The title to chapter 78, laws 1881, establishing a system of public instruction for the state of Nebraska, is broad enough to cover any and all necessary provisions relating to that subject, and whatever might have been originally made a part of that law may, at any time, be ingrafted upon it by legislation professing to be amendatory if germane to the section or sections amended.

2. ———: ———. The provisions of the amendatory act of 1909 (laws 1909, ch. 125), relating to the qualifications and the manner of appointing the members of the normal board of education, are germane to the subject of section 1, subd. XIII, as contained in the act of 1881 (laws 1881, ch. 78), establishing a system of public instruction, and are properly made a part thereof by amendment.

3. ———: ———. House roll No. 286, laws 1909, ch. 125, violates the provisions of section 11, art. III of the constitution, in that it amends and by implication repeals section 22, subd. XIII, ch. 79, Comp. St. 1907, and does not contain the section as amended, or purport to repeal the same.

4. ———: ———. Two separate and distinct acts adopted at different sessions of the legislature cannot be amended by an act which purports to amend only one of them.

ORIGINAL action in *quo warranto* to determine the rights of respondents to office as members of the board of education of state normal schools. *Writ allowed.*

*William T. Thompson, Attorney General,* and *E. C. Calkins,* for relator.

*W. D. Oldham* and *Clark & Allen, contra.*

BARNES, J.

This is an action in *quo warranto,* commenced in this court, attacking the validity of house roll No. 286, passed by the legislative assembly of 1909, approved by the governor on the 1st day of April of that year, and to oust the respondents from exercising the powers, rights, duties and franchises of members of the board of education of the state normal schools. The information sets forth the law as it existed before the passage of the amendments contained in the act above described, the statutes as amended thereby, the passage and approval of the amendatory act, the appointment of the respondents by the governor thereunder, and their confirmation by the senate, and challenges the constitutionality of the amendatory act for the alleged reason that it was passed in violation of section 11, art. III of the constitution of this state. It also sets forth the ineligibility of the respondent Majors to become a member of the board, because at the time of his appointment he was a member of the legislature which passed the amendatory act in question, and concludes with the usual prayer of ouster against all of the respondents. A demurrer was filed to the information on two grounds: First, that the facts stated therein are not sufficient to constitute a cause of action; and, second, that two causes of action are improperly joined. The cause has been submitted on the demurrer, and, it being the desire of the relator to test the validity of the amendatory act, that question will be first considered.

It appears that in 1881 the legislature passed an act (laws 1881, ch. 78) entitled "An act to establish a system of public instruction." This entire act was by the compiler carried into the successive Compiled Statutes as

chapter 79. In 1903 there was passed an act to establish junior normal schools, and provide for the maintenance of the same. Laws 1903, ch. 91. In preparing the Compiled Statutes of 1907, section 3 of the last mentioned act was inserted therein by the compiler and designated as section 22, subd. XIII, ch. 79 of that publication. Section 1, subd. XIII of the act first mentioned, before the adoption of the amendments in question, read as follows: "The state normal school shall be under the direction of a board of education, consisting of seven members, five of whom shall be appointed by the governor for a term of five years each, and the state treasurer and the state superintendent of public instruction shall by virtue of their office be members of said board: *Provided,* that the present appointed members of the board shall continue to hold their several offices till the limit of the time for which they were appointed. All vacancies occurring in the board shall be filled by appointment by the governor." Section 22 of the subdivision of the chapter above mentioned, as found in the Compiled Statutes of 1907, reads as follows: "The organization and management of said junior normal schools shall be under the jurisdiction of the state superintendent of public instruction, and he shall select the principals and instructors for said schools, and shall make and complete all other arrangements for the successful operation of said schools." By the amendment to section 1 there was created a board to be known as the "Normal Board of Education," which, it is declared, shall have control and direction of the normal education of the state, including normal schools and junior normal schools, which board shall succeed to, and take the place of, and exercise the powers of the former board of education. It is further provided that the normal board of education shall be composed of seven members, five of whom shall be appointed by the governor, by and with the advice and consent of the senate, and that the state treasurer and state superintendent of public instruction shall by virtue of their office be members of said board. The

amendatory act also provides for the details of such appointments, and the time of the expiration of the term of office of each of the appointees, together with their qualifications, which are as follows: "The persons to be appointed as members of such board shall be such as are known to be men of standing, education and integrity. They shall be so selected that the board shall not be composed wholly of persons who are members of or affiliated with the same political party or organization. No person appointed as a member of such board by the governor shall hold any office under the government of the United States or any other state. No member of said board shall serve on or under any committee of any political party." Section 22, as amended, reads as follows: "The organization and management of said junior normal schools shall be under the jurisdiction and direction of the Normal Board of Education and said board shall select the principals and instructors for such schools and shall make and complete all other arrangements for the successful operation of said school." The title to the amendatory act reads as follows: "An act to amend sections 1 and 22 of subdivision 13, chapter 79 of the Compiled Statutes of Nebraska for 1907, and to repeal the said original sections as they now exist, and to provide for an emergency."

The relator's first contention is that the title to the bill is insufficient; that it violates the provisions of section 11, art. III of the constitution, which reads as follows: "Every bill and concurrent resolution shall be read at large on three different days in each house, and the bill and all amendments thereto shall be printed before the vote is taken upon its final passage. No bill shall contain more than one subject, and the same shall be clearly expressed in its title. And no law shall be amended unless the new act contain the section or sections so amended and the section or sections so amended shall be repealed." It is argued that, where the title to the bill is to amend a particular section of an existing law, no amendment is permissible which is not germane to the subject matter of

the original section. In *Richards v. State,* 65 Neb. 808, it was said: "Whatever might have been originally made a part of a law may at any time be ingrafted upon it by legislation professing to be amendatory." It will be observed that the title to the original act is a comprehensive one, and is broad enough to include any provisions relating to the subject matter of education. It will scarcely be contended that this title was so restricted that the legislature could not have created a normal board of education thereunder, defined the qualifications of its members, and, if thought advisable, cover the whole ground of legislation relating to the general subject of education. Therefore, under the rule above quoted, it seems clear that the legislature could by amendment to section 1 change the name of the board, provide for the manner of its appointment, and define the qualifications of its members. Again, the word "germane" means pertinent to, or related to, and it seems self-evident that in an act to create a board of officers there could properly be included provisions touching their qualifications. If these are not related subjects, then we fail to comprehend the meaning of that term. If provisions descriptive of persons eligible for appointment to an office are not germane to an act creating such office, then, as was said by counsel on the argument, "an adjective is not related to a noun." We are therefore of opinion that this contention cannot be sustained.

It is further insisted that the amendatory act contains two subjects; that it changes the name of the board, and places the junior normals under its control. It appears that the original act of 1881, in which no mention is made of junior normal schools, was supplemented by the act of 1903, which provides for schools of that kind, and makes them a part of our system of public instruction; and it would therefore seem to be not only competent, but entirely proper, for the legislature to place them under the supervision of the normal board of education by an amendment to the proper section of that act, for the junior

normal course of instruction, as defined by the statute, is one of the regular normal courses, to wit, the elementary course, and is therefore related to the general subject of normal education.

The relator also insists that the act in question, in effect, amends 16 other sections of subdivision XIII, ch. 79, as found in the Compiled Statutes of 1907; that the sections so amended are not included therein, and said sections are not repealed, and it is therefore violative of the clause of the section of the constitution above quoted. In *Farrell v. State*, 54 N. J. Law, 421, it is said: "The effect of an amendment of a section of the law is not to sever it from its relation to other sections of the law, but to give it operation in its new form as if it had been so drawn originally, treating the whole act as a harmonious entirety, with its several sections and parts mutually acting upon each other." Now, it is apparent that sections 2 to 16 do not require, nor have they suffered, any change by the amendments. Now, as before the amendment, they refer to the board created by section 1. As the act amends the section which created an educational board, and places the normal schools under its control, it must be presumed that the legislature merely intended to amend the name of the existing board. The original section did not purport to give the existing board a specific name. It is merely referred to as the board of education. It would have been proper, as above stated, to give it the name of normal board of education in the original section, and the rule laid down in *Richards v. State, supra*, would allow the legislature to give it this name by the amendment. Had the original section conferred upon the board the name of "Normal Board of Education," no change in the language of sections 2 to 16, inclusive, would have been required. Those sections do not purport to create the board or give it a name. They merely enumerated the powers possessed by the board as created by the first section. Any language indicating that the board upon which the powers were conferred is the board mentioned in the

first section would be sufficient. It seems to us neither necessary nor desirable to substitute the name "Normal Board of Education" for the words "said board" where they occur in the above named sections. If the language with reasonable certainty indicates what board is referred to, and we think it does, nothing more is required. We think this sufficiently disposes of the relator's contention so far as sections 2 to 16 are concerned.

It appears, however, that prior to 1909 it was the policy of the legislature to commit to the state superintendent of public instruction the location and complete management of the junior normal schools. To that end section 21 of the statute as it stood before the passage of the act in question located schools at Alliance, McCook and Valentine, respectively, and the state superintendent of public instruction was specifically authorized to locate not to exceed five, nor less than two, additional schools at such places in the state as might seem proper to him. That section, preceding the amendment of 1909, also provided: "At each place where a junior normal school is established the public school buildings, text-books and apparatus of the public school district shall be placed at the service of the state, without cost, under the jurisdiction of the state superintendent of public instruction. In each county where a junior normal is established not less than three-fourths of the. entire institute fund shall be used by the state superintendent of public instruction toward defraying the expenses of such junior normal schools." Section 22 provided: "The organization and management of said junior normal schools shall be under the jurisdiction of the state superintendent of public instruction, and he shall select the principals and the instructors for said schools, and shall make and complete all other arrangements for the successful operation of said schools." The legislation as originally enacted was harmonious and placed the state superintendent in complete control of every detail of the operation of junior normal schools. Now, the amendatory act of 1909 does

not refer to section 21, *supra,* but amends section 22 by substituting the board created by the first section thereof for the superintendent of public instruction. If the act is valid, the state superintendent has sole authority to locate from two to five of the junior normal schools, also to control all of the buildings, and the manner and kind of books and apparatus to be used by the teachers and scholars. The superintendent is also commanded to expend part of the county institute fund in defraying the expense connected with the junior normal schools, while section 22, as amended, purports to place the management of those schools under control of the new board. That there is a conflict in authority between the superintendent and the board is apparent from an inspection of the statute as now amended; that the last act of the legislature will amend section 21, *supra,* by implication, if it is given the legitimate scope which its language suggests, is also apparent. It therefore seems to us that the legislation in question violates that part of section 11, art. III of the constitution, which reads as follows: "No bill shall contain more than one subject, and the same shall be clearly expressed in its title. And no law shall be amended unless the new act contain the section or sections so amended and the section or sections so amended shall be repealed." *Smails v. White,* 4 Neb. 353; *City of Tecumseh v. Phillips,* 5 Neb. 305; *Sovereign v. State,* 7 Neb. 409; *State v. Board of County Commissioners,* 10 Neb. 476; *State v. Board of County Commissioners,* 17 Neb. 85; *State v. Corner,* 22 Neb. 265; *Sheasley v. Keens,* 48 Neb. 57.

It may be said that the new board and the superintendent can act in harmony under the law. But, if they do not, who will prevail? The law gives the superintendent possession and custody of all things other than money necessary for the operation of the junior normal schools, and he is responsible to the respective school districts for the buildings, books and apparatus. To properly discharge his duties he may make all reasonable rules for the use by the students and teachers of such property. If his

rules do not comport with the views of the normal board and the teachers it has employed, whose will shall control? The law certainly does not contemplate, and should not tolerate, any such division of authority. It is apparent, however, that the intention of the legislature was to take from the state superintendent all authority over those schools. To make the legislation effective it must be held to amend by implication section 21, *supra*. The act being amendatory, it seems. to us that it is void unless we are prepared to say that the provisions relating to junior normal schools may ·be separated from the rest of the amendatory act and the remainder held good. That is to say, that the amendment to section 1, ch. 79, may be separated from the amendment to section 22, subd. XIII thereof, and that the last named amendment was not an inducement to the passage of the act. This we are unable to do. It is with the utmost reluctance that we are compelled to hold that the amendatory act in question is void; but we can see no way to avoid such a holding unless we are prepared to overrule all of our decisions last above cited, together with many others upon the same subject. This we decline to do.

Again, in another material respect the act violates the constitutional provision that "no law shall be amended unless the new act contain the section or sections so amended and the section or sections so amended shall be repealed." Const., art. III, sec. 11. The state normal school at Peru and the state normal school at Kearney were created and are governed by two separate and independent acts passed at different sessions of the legislature. By means of the act in question the legislature has attempted to amend both of these independent acts by the amendment of one of them alone. In other words, by a single bill purporting to amend only one section of the act creating and governing the state normal school at Peru, the legislature has attempted to amend the other independent act creating and governing the state normal school at Kearney. The statute demonstrates this prop-

osition. In 1901, as shown by section 1, subd. XIII, ch. 79 of the Compiled Statutes of that year, the state normal school at Peru was governed by the following provisions of an independent act (laws 1881, ch. 78, subd. XIII): "The state normal school shall be under the direction of a board of education consisting of seven members, five of whom shall be appointed by the governor for a term of five years each, and the state treasurer and the state superintendent of public instruction shall by virtue of their office be members of said board: *Provided,* that the present appointed members of the board shall continue to hold their several offices till the limit of the time for which they were appointed. All vacancies occurring in the board shall be filled by appointment by the governor." Comp. St. 1901, ch. 79, subd. XIII, sec. 1. The state normal school at Kearney is not governed and was not created by an amendment of the foregoing section, but by an independent act entitled "An act to locate and establish one (1) additional state normal school and to provide for the erection of buildings, payment, maintenance and receiving donations for the same." Laws 1903, ch. 90. Under the foregoing title the independent act of 1903 was passed, which contains the following provisions: "That the said school herein before provided for shall be in all respects under the direction and control of the board of education of the present state normal school, as provided by section one, subdivision thirteen, chapter seventy-nine of the Compiled Statutes of Nebraska for 1901, and that said school shall be for the same purpose and governed in all respects by the provisions of the statutes now in force regulating and governing the present state normal school at Peru, Nemaha county, Nebraska." Comp. St. 1903, ch. 79, subd. XIII, sec. 19. The effect of this enactment by reference therein to section 1, subd. XIII, ch. 79, Comp. St. 1901, was to insert bodily in the Kearney normal school act the following provisions for the control and government of that school: "The state normal school shall be under the direction of a board of education, con-

sisting of seven members, five of whom shall be appointed by the governor for a term of five years each, and the state treasurer and the state superintendent of public instruction shall by virtue of their office be members of said board: *Provided,* that the present appointed members of the board shall continue to hold their several offices till the limit of the time for which they were appointed. All vacancies occurring in the board shall be filled by appointment by the governor." Comp. St. 1901, ch. 79, subd. XIII, sec. 1.

It thus appears that the Peru and Kearney normal schools are governed by independent acts, each containing the foregoing provision, and neither is dependent on the other. The legislature in passing the Kearney normal school act inserted bodily therein by reference the provisions governing the normal school at Peru. In other words, the foregoing section is the statute governing the Peru normal, and by reference or construction is also the independent, governing statute of the Kearney normal. The two statutes are separate and apply to different institutions, and the repeal or amendment of one does not repeal or amend the other. The law establishing this proposition is universal. This court in *Shull v. Barton,* 58 Neb. 741, approved the following language from Endlich, Interpretation of Statutes, sec. 492: "Where the provisions of a statute are incorporated, by reference, in another; where one statute refers to another for the powers given or rules of procedure prescribed by the former, the statute or provision referred to or incorporated becomes a part of the referring or incorporating statute; and if the earlier statute is afterwards repealed, the provisions so incorporated, the powers given, or rules of procedure prescribed by the incorporated statute obviously continue in force, so far as they form part of the second enactment." When the legislature convened in 1909, therefore, the Kearney normal school, by an independent statute governing that institution, was controlled by a

board consisting of seven members, five of whom were appointed for a term of five years under the statutes as they existed in 1901. It follows that it was not within the power of the legislature by an act for the sole purpose of repealing or amending that part of the Peru normal act which created the governing board to repeal or amend also the same provision in the independent act creating and governing the state normal school at Kearney. The repeal of part of the Peru normal school act did not repeal the same provision in the Kearney normal school act. The rule of this court is: "Where one statute refers to another, which is subsequently repealed, the statute repealed becomes a part of the one making the reference and remains in force so far as the adopting statute is concerned." *Shull v. Barton,* 58 Neb. 741.

The legislature of 1909 repealing the governing section of the Peru normal did not therefore repeal the independent, governing section of the Kearney normal. It is just as certain that the attempt to amend the Kearney normal school act by an amendment of the Peru normal school act was equally futile. The rule applicable has been stated as follows: "An act which declares that the provisions of a special act shall apply to another city than that for which it was passed has not the effect of making subsequent amendments to the original act applicable to the second city. * * * *Knapp v. City of Brooklyn,* 97 N. Y. 520." Black, Interpretation of Laws, ch. 13, sec. 132. For example, if the amendatory act of 1909 be sustained, it will be possible for the legislature in passing a charter for the city of Lincoln to insert therein by reference the governing provisions of the Omaha charter and by a subsequent amendment of the last named charter change the form of government of the city of Lincoln and abolish its offices, without making any reference whatever to the Lincoln charter. Such amendments are surreptitious legislation, which the constitution condemns, and they cannot be sanctioned. The act in question is a plain, direct and unmistakable violation of the constitu-

tion. The necessity of upholding acts of the legislature is never so urgent as to require the courts to destroy the constitution which is the permanent foundation on which the government rests. It may be suggested that the sanctity of legislative acts requires us to eliminate that part of the amendatory statute which is clearly in conflict with section 21 above mentioned, and uphold the remainder of it. We freely concede that this may be done in certain cases. But in the present case we cannot pursue such a course, because the point last above mentioned is a complete bar to the adoption of that rule. The amendatory act contains an attempt to amend and repeal the governing statute of the Kearney normal school by amendment of an independent statute relating to the state normal school at Peru, and for that reason contravenes the constitutional provision that "no law shall be amended unless the new act contain the section or sections so amended and the section or sections so amended shall be repealed."

It was suggested in consultation that the point last above mentioned was not presented on the argument or in the brief of the relator, and therefore should not be considered. · The answer to the suggestion is that this is an action on behalf of the state brought by the attorney general to test and determine the question of the validity of the statute in order to further the educational interests of the state, and, if for any reason we are convinced that the statute is unconstitutional, we ought to so determine; for, if the courts can, under such a pretext, nullify the constitution, we will soon find ourselves openly defying the provisions of the fundamental law which we have solemnly sworn to uphold.

For the foregoing reasons, we are constrained to hold that the amendatory act in question is void; the demurrer of the respondents is therefore overruled, and the writ of *quo warranto* prayed for by the relator will issue.

JUDGMENT ACCORDINGLY.

ROSE, J., concurring.

To my mind Judge BARNES demonstrates that the legislature could not change the provisions of the act governing the state normal school at Kearney by a bill limited to the sole purpose of amending the act governing the state normal school at Peru, without violating the constitutional provision that "no law shall be amended unless the new act contain the section or sections so amended and the section or sections so amended shall be repealed." Const., art. III, sec. 11. That the legislature of 1909 attempted to change the management of the state normal school at Kearney in the manner stated is in my judgment shown in unmistakable terms on the face of the amendatory act itself. By amendment of a single section of the Peru normal school act there is an attempt to wrest from the present board of education and transfer to a newly created "Normal Board of Education" the entire control and management of the Kearney normal school. The ·act purporting to ˙amend only the Peru normal school act declares: "There is hereby created a board to be known as 'The Normal Board of Education,' which board *shall have control and direction of the normal education of the state, including normal schools* and junior normals, and which board *shall succeed to and take the place of and exercise the powers of the present 'Board of Education.'* " Comp. St. 1909, ch. 79, subd. XIII, sec. 1. It was therefore the intention of the lawmakers, as declared by their language, to change the management of the Kearney normal school by an amendment of the Peru normal school act. The members of the normal board of education appointed under that amendment of the Peru normal school act understand by it that they have authority under it to take charge of the school at Kearney, and are attempting to do so. One of the purposes of this suit is to prevent them from managing and controlling that school. The opinion prepared by Judge BARNES shows conclusively that the amendatory act is void in so

far as it attempts to confer on defendants the power to manage the Kearney normal school, and I concur in his conclusion that the entire amendatory act is condemned by the constitution. The language which confers on the new board the power to control the school at Kearney is the identical language giving it control of the Peru normal school. How can the language be separated? When the unlawful provision is smitten by the constitution, nothing remains. The words employed to amend the Peru normal school act are the words which contain the unlawful amendment of the Kearney normal school act. How is it possible to strike out the words forbidden by the supreme law and leave any expression of legislative will? When the void part is eliminated, nothing remains. The intention to amend the Peru normal school act is found in the language which discloses the intention to amend the Kearney normal school act. With the void provision eliminated, where is the expression of an intention on the part of the legislature to amend the Peru normal school act? It has no existence. These questions are all answered by the following language of Chief Justice HOLCOMB: "Where a part of an act is unconstitutional, because contravening some provision of the fundamental law, the language found in the invalid portion of the act can have no legal force or efficacy for any purpose whatever." *State v. Insurance Co.,* 71 Neb. 335.

I am unable to discover in the amendment any valid provision, and I agree that the writ should issue.

REESE, C. J., concurring in part, and dissenting in part.

In most respects I agree with the holdings in the opinion of the majority of the court. While I think the act of 1909 is defective, and in some respects vicious and reprehensible legislation, I am not fully convinced that the legislature has gone beyond its power under the constitution. I agree that under the authorities cited in *Shull v. Barton,* 58 Neb. 741, and in *Sika v. Chicago &*

*N. W. R. Co.,* 21 Wis. 370, "a statute which refers to and adopts the provisions of another statute is not repealed by the subsequent repeal of such other statute," and which affirms *Crosby v. Smith,* 19 Wis. *449. In 1 Sutherland, Statutory Construction (Lewis, 2d ed.), sec. 257, it is said: "A statute which refers to and adopts the provisions of another statute is not repealed by the subsequent repeal of the original statute adopted, but the provisions adopted continue in force so far as the new statute is concerned"—citing a number of cases. In *Phœnix Assurance Co. v. Fire Department,* 117 Ala. 631, the court, in referring to the class of statutes to which the act of 1903 creating the Kearney normal school belongs, say: "It belongs to a distinctive class of statutes, known or termed as reference statutes, not of infrequent enactment, constitutional limitation not forbidding. Statutes which refer to, and by reference adopted wholly, or partially, preexisting statutes. In the construction of such statutes, the statute referred to, is treated and considered, as if it were incorporated into, and formed part of that which makes the reference. (Citing cases and authorities.) The two statutes coexist as separate and distinct legislative enactments, each having its appointed sphere of action; and the alteration, change, or repeal of the one, does not operate upon or affect the other." In *Queen v. Stock,* 3 Nev. & P. (Eng.) 420, decided in 1838, in the course of argument, counsel propounded the question whether the repeal of an earlier act which had been referred to and adopted in a later one did not also repeal the later referring and adopting act. Lord Denman, C. J., responded: "That point clearly cannot be maintained." The same rule is stated and adopted with the citation of a number of cases in *Wick v. Ft. Plain & R. S. R. Co.,* 27 App. Div. (N. Y.) 577; *Schwenke v. Union Depot & R. Co.,* 7 Colo. 512, and in *People v. Webster,* 28 N. Y. Supp. 646. In *State v. Leich,* 166 Ind. 680, it is said: "When a statute adopts a part or all of another statute by a specific and descriptive reference thereto, such adoption

State v. Majors.

takes the statute as it exists at the time of the adoption and does not include subsequent additions or modifications of the statute unless it does so by express intent." This decision is annotated in 9 Am. & Eng. Ann. Cas. 302. In the note it is said: "It is a generally accepted rule of statutory construction that when a statute adopts a part or all of another statute by a specific and descriptive reference thereto by its title or otherwise, such adoption takes the statute as it exists at the time of the adoption and does not include subsequent additions to or modifications of the statute so adopted, unless it does so by express or necessarily implied intent"—citing cases from England, United States supreme court, Arizona, California, Colorado, Illinois, Kentucky, Maine, Michigan, Missouri, Nebraska, New York, Pennsylvania, South Carolina, Texas, Vermont, Washington and Wisconsin. And in the same note it is said: "The two statutes exist as separate and distinct legislative enactments, each having its appointed sphere of action; and the alteration, change, or repeal of the one does not operate upon or affect the other"—citing cases.

This rule being the established and well-recognized law of this country and of this state, it remains for us to inquire as to its applicability to the acts of the legislature under consideration. The act creating the state normal school at Peru was passed in 1867, and took effect June 20 of that year. The title of the act was "An act to locate, establish, and endow a state normal school." The first section provides: "That a state normal school be established at Peru, in Nemaha county, Nebraska, the exclusive purpose of which shall be the instruction of persons, both male and female, in the arts of teaching," etc. Further provisions of this section need not be here noticed. Section 2 is as follows: "The said normal school shall be under the direction of a board of education, and shall be governed and supported as hereinafter provided." The third section provides for appointment of the board of education, and, together with subsequent sections, the

duties of the members thereof. In 1881 the law was amended, and section 1 of subdivision XIII, was enacted and remained unchanged until the passage of the act of 1909, now under consideration. It will be observed that all enactments hereinbefore cited referred to the normal school at Peru. There were no others in existence, and all references in the act were to it and it alone. In 1903 the legislature, by the act which took effect July 9 of that year, established and provided for the location of an additional state normal school. The title of the act is "An act to locate and establish one (1) additional state normal school and to provide for the erection of buildings, payment, maintenance and receiving donations for the same." Without referring to the body of the act in detail, it is sufficient to say that the act is not amendatory of any other law in any respect and contains no reference to the law establishing and governing the normal school at Peru, except in the particular hereafter named, but is an independent act depending on no other for its existence and enforcement. The fourth section is as follows: "(Management.) That the said school hereinbefore provided for shall be in all respects under the direction and control of the board of education of the present state normal school, as provided by section one, subdivision thirteen, chapter seventy-nine of the Compiled Statutes of Nebraska for 1901, and that said school shall be for the same purpose and governed in all respects by the provisions of the statutes now in force regulating and governing the present state normal school at Peru, Nemaha county, Nebraska." Laws 1903, ch. 90. I call attention to the peculiar wording of the section. That school "shall be in *all respects* under the direction and control of the board of education of the *present state normal school, as provided by section one,* subdivision thirteen, chapter seventy-nine of the Compiled Statutes of Nebraska for 1901, and that said school shall be for the same purpose and governed in all respects by the provisions of the statutes *now* in force regulating and gov-

erning the present state normal school at Peru, Nemaha county, Nebraska." There is no provision in the act which by any stretch of reasoning can be construed as rendering the act liable to any change by amendment or repeal of the prior law. The "additional" normal school is to be governed by the law as it *then* existed with reference to the Peru school. In other words, section 1 of the earlier act was ingrafted in and made a part of the new law to the same extent as if it had been copied therein. Now, by the numerous holdings above cited, the amendment, change, or modification of section 1 for the government of the Peru school could have no possible effect upon the act of 1903, which created and established the Kearney school. It is as clear as the noonday sun that the act of 1903 remains unchanged, and is in existence and in force as it would have been had the act of 1909 not been passed. The inevitable result is that the Peru school is governed by the law of 1909, if valid, and the Kearney school by that of 1903, a most anomalous condition, but for which the lawmaking power is alone responsible. It may be argued that, by the growth of the state and the laws passed by the different sessions of the legislature, the normal schools of the state have grown into a system or chain of such schools, and that all were governed by the amended section at the time of the enactment of the act of 1909, but such is clearly not the case. As held in the opinion of the majority of the court, each of the two schools have their existence under and depend upon entirely separate and distinct laws. There is no normal school system in, on, or about it, so far as the statutes are concerned.

The question now arises: Is any part of the act of 1909 valid? It must be conceded that the matter of the existence, government and control of the normal schools is in the first instance with the lawmaking power, the legislature, subject only to the provisions of the constitution. As the Peru normal is a creature of the legislature by the one act establishing it, that act may be amended,

modified or repealed, according to the will of that body. I think the act is effective in so far as it relates to that school, but not to the school at Kearney. There seems to have been no effort made to reach that institution or in any way to molest it, and therefore it will be managed, controlled and governed as heretofore. This state of things, if true, is to be deplored, but we must accept the law and the constitution as we find them.

In this discussion I have not deemed it necessary to refer to any acts of the legislature passed subsequent to the act under consideration, for the reason that none of them could have any effect or bearing upon the question involved in this case.

DEAN, J., dissenting separately.

I dissent from the majority opinion. The importance of the subject under consideration and the high esteem in which my associates are held impel me to submit at some length the reasons for this dissent. On some features of the present case the views set forth in the dissenting opinion in *State v. Junkin, ante,* p. 1, with the authorities there cited, so far as applicable to the present case, are here reaffirmed. The majority opinion holds that the amendatory act in question violates that part of section 11, art. III of the constitution, which reads: "No bill shall contain more than one subject, and the same shall be clearly expressed in its title. And no law shall be amended unless the new act contain the section or sections so amended and the section or sections so amended shall be repealed." This language seems to embrace two closely related subjects, the first relating to the contents of a bill and its title as related thereto, the second relating to the amendment of an existing law. What is the purpose of the constitutional provision relating to an amendment of an existing law? What is the reason for the rule? Clearly its purpose is that an amendment to an existing statute may not be given the form and the force of law

which contains a meaning that is not distinctly revealed by the language used. It is to prevent surreptitious legislation that might result either from striking out or adding a word here or a paragraph there without setting forth the section in full as amended. It is to prevent surprise to the legislator and to prevent the public from being deceived as to proposed legislation. The rule is salutary and these are some of the reasons for its adoption. No complaint has been made of any deception in the respects noted and none appear upon the face of the amendatory act nor from the record before us. It is true the act does not refer by section number to one of the sections sought to be amended, but its language so clearly refers to the subject of that section that no one can be misled as to the legislative intent. The purpose, the intent and the spirit of the fundamental law are fulfilled when the subject of the section sought to be repealed is fairly and clearly identified and referred to by the language of the amendatory act, even though the section number may be omitted. The constitution is not to be construed so as to destroy legislation that is not clearly inhibited by its language. A grave peril lies in the direction of a judicial annulment of the legislative will that is not clearly and beyond question warranted by a reasonable interpretation of that instrument. It has been well said by a great advocate: "The letter killeth but the spirit giveth life."

The normal schools and the normal training schools of the state in their origin and development and in practical operation and in contemplation of the law governing them comprise a complete and harmonious normal school system. In this sense they have heretofore been treated by the legislature and in this sense they are contemplated by the amendatory act in question. In pursuance of this policy the act authorizing the creation of the Kearney normal school in 1903 appears in the Compiled Statutes as sections 17, 18, 19, subd. XIII, ch. 79, in the compilations of 1903, 1905, 1907 and 1909. The act creating the

Wayne normal school in 1909 follows the Kearney normal school act as section 19a.

Black, Interpretation of Laws, sec. 86, says: "In the course of the entire legislative dealing with the subject we are to discover the progressive development of a uniform and consistent design, or else the continued modification and adaptation of the original design to apply it to changing conditions or circumstances. In the passage of each act, the legislative body must be supposed to have had in mind and in contemplation the existing legislation on the same subject, and to have shaped its new enactment with reference thereto." See, also, Cooley, Constitutional Limitations (7th ed.), p. 241, and note 1; *People v. Mahaney,* 13 Mich. 481; *Mok v. Detroit Building & Savings Ass'n,* 30 Mich. 511; *Bush v. City of Indianapolis,* 120 Ind. 476; *Fenton v. Yule,* 27 Neb. 758; *People v. Judge,* 39 Mich. 195.

Referring to the provisions relating to junior normal schools, the majority opinion holds, in substance, that the act as amended is not only repugnant to the constitution but that it may lead to a conflict of authority between the newly created board and the state superintendent, and, while this is not assigned as a reason for holding the act invalid, the inference is that it probably has some bearing upon and is perhaps in part one of the reasons that lead to the conclusion reached in the opinion. A conflict of authority that exists only in anticipation should not be thrown into the balance to weigh against the validity of a legislative act. Until the conflict impends or until it appears full fledged, clothed with destructive force, it is not ordinarily a proper subject for judicial inquiry.

The normal school system is a creature of the legislature and that branch of government alone is charged with the responsibility of enacting legislation for its government. The judiciary is not called upon to share this responsibility. Entertaining the views herein announced, it is my judgment the writ prayed for by the relator

should not issue, but that a time should be fixed for hearing that feature of the case that is involved in the appointment of respondent Majors, who was a member of the legislature when appointed by the governor to a position on the normal board.