IRA E. TASH, APPELLANT, V. LUTHER P. LUDDEN ET AL., APPELLEES.

FILED JANUARY 9, 1911. No. 16,858.

1. Schools: NORMAL SCHOOLS: VALIDITY OF STATUTE. April 5, 1909, the legislature passed an act to establish and locate an additional state normal school; and, supposing at the time that another act passed April 1, 1909, creating the "Normal Board of Education," was a valid act, and that such board was the one upon which would devolve the carrying into effect of the said first named act, its name was used in said act. By subsequent proceedings in this court, in *State v. Majors*, 85 Neb. 375, the act of April 1, 1909, was held unconstitutional and void. *Held*, That the act of April 5, 1909, was not invalidated by the mistake of the legislature as to name, and that the duty of carrying it into effect devolved upon the existing board, defendant herein.

2. ———: ———: LOCATION: CONSTRUCTION OF STATUTE. The act of April 5, 1909, provided that cities and towns competing for the location of the state normal school should file their applications with the secretary of the Normal Board of Education within 60 days after the said act became effective. *Held*, That time was not of the essence of the thing to be done, and that such provision was directory merely, and not mandatory.

3. ———: ———: ———: ———. And the fact that prior to the decision of this court in *State v. Majors*, 85 Neb. 375, on November 15, 1909, the Board of Education was unwilling to take the responsibility of establishing and locating the school provided for in said act did not deprive said board of its right to thereafter proceed with the discharge of the duties enjoined by said act.

4. ———: ———: ———: ———. And the fact that the city of Chadron filed its application with the "Normal Board of Education," instead of with the Board of Education, did not preclude such city from having its application considered by the Board of Education after it had resumed the exercise of its powers and functions, it appearing that said application was received and filed by said board before it had taken any action in the premises.

5. ———: ———: ———: ———. And the failure of defendant board to visit the various cities and towns competing for the location of the state normal school and select a site for the location of said school within the time specified in the act of the legislature was immaterial, as the later visitation of such points and selection of such site accomplished the substantial purposes of the statute.

6. **Corporations:** POWER TO DISPOSE OF PROPERTY. All corporations capable of taking and holding property have the *jus disponendi* as fully as natural persons, except so far as they are restrained by statute, or are prohibited by their articles of incorporation or outstanding contracts; and under this general power a corporation may dispose of the whole of its property for any lawful purpose.

7. **Colleges and Universities:** POWER TO DISPOSE OF PROPERTY. A college incorporated by the statutory number of resident freeholders, for "the promotion of Christian education by harmoniously developing the moral, mental and physical powers of those who share its advantages," which obtains its real estate by purchase and receives its title thereto in an unconditional warranty deed, and whose trustees are elected "by the Northwestern Association of Congregational Churches in Nebraska," and which obtains a considerable portion of its funds by soliciting and obtaining "written subscriptions by way of contributions from people of all denominations and of no denomination, which were given and paid in the treasury of the corporation without any written condition, trust, purpose or obligation, except that the same were to be used for the purposes of the corporation in purchasing land, erecting buildings, putting them up and supplying the school," does not thereby become a religious, sectarian or eleemosynary corporation or institution, so as to preclude a sale by the trustees of said corporation of any or all of its property, real or personal, which sale will not divert the property from the purpose for which it was obtained and used by such corporation.

8. **Schools:** NORMAL SCHOOLS: LOCATION. The evidence examined and set out in the opinion as to the acts of the Board of Education, defendant herein, subsequent to the decision of this court in *State v. Majors*, 85 Neb. 375, in relation to the establishment and location of an additional normal school at Chadron, *held* within the scope of the powers delegated to such board by the act of April 5, 1909.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Affirmed.*

*C. C. Flansburg,* for appellant.

*Arthur T. Mullen, Attorney General, Grant G. Martin, Frank M. Hall* and *Albert W. Crites, contra.*

FAWCETT, J.

By the act of June 20, 1867, the legislature established and located the first state normal school at Peru. Laws 1867, p. 80. By the act of April 8, 1903, the legislature authorized the Board of Education to establish and locate one additional normal school. Laws 1903, ch. 90. Under the latter act, what is known as the "Kearney Normal School" was established and located in that city. April 5, 1909, the legislature passed an act to establish and locate an additional state normal school "at some suitable location west of the east line of the Sixth congressional district and north of the 42 parallel of latitude in the state of Nebraska." Laws 1909, ch. 126. April 1, 1909, the legislature passed an act creating a board to be known as the "Normal Board of Education," and providing that such board "shall have control and direction of the normal education of the state, including normal schools and junior normals, and which board shall succeed to and take the place of and exercise the powers of the present 'Board of Education,' as herein provided. Said 'Normal Board of Education' shall be composed of seven members, five of whom shall be appointed by the governor, by and with the advice and consent of the senate. The state treasurer and state superintendent of public instruction shall be, by virtue of their office, members of the said board." Laws 1909, ch. 125. The act last above noted was passed with an emergency clause, and provided that "the five persons first appointed by the governor as members of said board, shall be appointed within ten days after this act takes effect and before the adjournment of the present session of the legislature if practicable." In accordance therewith the governor appointed the five members provided for, and they were confirmed by the senate. One of the members so appointed was Senator Thomas J. Majors, a member of the senate, who participated in the passage of said act. The attorney general, believing that the duties of the "Board of Education" and of the "Normal

Board of Education" were conflicting, and that the validity of the act creating the latter board was doubtful, instituted proceedings against Senator Majors and the other gentlemen holding as members of the Normal Board of Education by appointment of the governor to determine the validity of the act referred to. The result was that on November 15, 1909, this court decided that the said act of April 1, 1909, creating the said "Normal Board of Education" was unconstitutional and void. *State v. Majors,* 85 Neb. 375. During the pendency of the suit of *State v. Majors,* neither board attempted to perform any of the functions of their office, except to receive and file such papers and documents as might be tendered.

Section 2 of the act of April 5, 1909 (laws 1909, ch. 126), providing for an additional state normal school, reads as follows: "Within sixty days after this act takes effect the various towns, villages and cities in the aforesaid territory competing for the location of said normal school shall transmit to the secretary of the Normal Board of Education in a sealed envelope an application for said normal school together with such other information as may be deemed proper together with a good and sufficient bond for a deed to the state of Nebraska for 80 acres of land to be used perpetually for a site for said school in the event that such city, town or village is finally selected within ten days after September 1, 1909. The normal school board shall visit the various villages, towns and cities competing for said normal school and said board shall select therefrom a site for said school, said board shall be governed in the selection of said site by the educational interests of said territory and the state of Nebraska. Before any proposal shall be definitely accepted the city, village or town making such proposal shall present a good and sufficient deed of conveyance of said site to the state of Nebraska, free and clear of all liens and incumbrances, and an abstract of title to be examined and approved by the attorney general. The said board shall forthwith thereafter employ a competent architect to

prepare plans and specifications for a suitable building or buildings, and upon the adoption of the same the board shall at once advertise for sealed proposals for the erection and completion of said building or buildings in accord- ance with such plans and specifications, and shall let the contract to the lowest approved bidder therefor, who shall be required to enter into a written contract for the erection and completion of said building or buildings in accordance with the plans and specifications adopted by said board. Said contractor shall be required to give a bond for the faithful performance of the contract, to be approved by the board, in such amount as it shall pre- scribe. Said board shall have authority to employ an architect to superintend the construction of said building. Upon the completion of the transfer of the site to the state, the said board shall so notify the auditor of public accounts in writing."

The passage of the act for the creation of an additional normal school brought into the field six competitors for the location thereof, viz., Ainsworth, Alliance, Chadron, Crawford, Gordon, and Rushville. The city of Alliance filed its application with both boards. The city of Chad- ron and the other competitors filed their applications with the Normal Board of Education alone, but after the de- cision in *State v. Majors,* these applications were all transferred to the Board of Education, and, having been received by that board before any steps were taken by it in the premises, the essential requirement of the act, in that particular, was complied with. After the decision of this court in *State v. Majors,* the Board of Education re- assumed its duties and functions. The city of Chadron filed with its application a bond for a deed to the state of Nebraska of 80 acres of land, in accordance with the terms of section 2, *supra.* After reassuming the exercise of its powers and functions, the defendant board notified all competing towns that applications would be received and considered, as required by said act. On or about January 3, 1910, defendant board commenced their round

of visitation and visited all of the cities and towns above enumerated. After considering all the advantages and disadvantages of each location tendered, the board selected the city of Chadron as the site for such normal school, and immediately notified the various competing towns and cities of such selection. The 80 acres of land proposed to be donated by the city of Chadron has for 15 or 20 years last past been owned by the Chadron academy, a corporation with its principal place of transacting its business in the city of Chadron, and incorporated for "the promotion of Christian education by harmoniously developing the moral, mental and physical powers of those who share its advantages; the erection and maintenance of such buildings and structures as may be deemed necessary, and to purchase real estate as a site therefor; and especially to do all things necessary or expedient for the benefit and development of an educational institution." The articles of incorporation provided that the existence of the corporation should commence on the 24th day of July, 1888, and continue indefinitely. It further provided that the business of the corporation "shall be conducted by a board of twelve trustees to be elected by the Northwestern Association of Congregational Churches in Nebraska at such time and place, and in such manner, as shall be prescribed by the constitution and by-laws of said corporation." After deciding that the city of Chadron was the proper place for the location of the normal school, defendant board imposed some additional conditions upon the city. The city at once furnished the board a good and sufficient bond that it would comply with such additional conditions. This bond and the bond for a deed were both duly approved by the board. Abstracts of title to the land tendered were then furnished the board by the city, and were at once delivered by the secretary of the board to the attorney general for his examination and approval. At the time of the commencement of this suit, the attorney general had not completed his examination of such abstracts, and hence had not approved the same.

Plaintiff bases his claim for an injunction restraining the board from locating the normal school at Chadron upon the following grounds: "First. Appellees had no power or authority to select a site or to take any action whatever under the law, the sole right of selection being vested in another tribunal, to wit, the 'Normal Board of Education.' Second. The land offered as a site belongs to an eleemosynary institution holding title in trust, without any authority to sell and convey, and the state could not take title through said deed. Third. Appellees selected a site, chose an architect, approved his plans for a building, and appropriated $30,000 for its erection before the title was approved or passed upon by the attorney general."

The case was commenced in the district court for Lancaster county. Trial to the court. Finding and decree for defendant, and plaintiff appeals.

It is urged by defendants that plaintiff, in his capacity as a taxpayer and president of the Alliance Commercial Club, is not entitled to maintain this suit; and, further, that the petition showing that the abstract of title which had been furnished was in the hands of the attorney general, but had not yet been examined and approved by him, the suit was premature, and plaintiff's petition was properly dismissed for that reason alone. Inasmuch as important educational interests of the state are involved, and for the purpose of avoiding possible further litigation, we will not follow the line of least resistance by disposing of the case upon either of the points named, but will consider it upon the merits; and in doing so we will consider plaintiff's contentions in the order above set out.

First. Had defendant board authority in the premises? It is contended by plaintiff that, by the passage of the act of April 1, 1909, the legislative purpose was to create the Normal Board of Education in addition to the existing Board of Education. He argues that there can be no doubt about this, because the language of the statute is *"created* a board." He further says: "But whether the

legislature intended to *'create'* a new tribunal, as stated in the act, or merely to substitute the 'Normal Board of Education' for the existing Board of Education, is, for the purpose of this discussion, entirely immaterial, as the legislative intent manifested by this act was certainly to do one or the other." In this statement we concur. It was undoubtedly the "intent" of the legislature to either create a new board, or to substitute a new board for the existing board; but the trouble is, by failing to comply with constitutional requirements, it failed to do either. The fact that the governor appointed a "Normal Board of Education" before the act creating it was declared invalid by the judgment of this court does not alter the fact that the legislature failed to abolish or supersede the existing board by either creating a new board in addition thereto, or by substituting a new board therefor. This being true, we think this case must be considered as though the act of April 1, 1909, had never been passed; and, in determining whether the board of education has proceeded according to law in locating a normal school in the city of Chadron, we must look alone to the act of April 5, 1909. Looking at that act, the question arises: What did the legislature· have in contemplation when it passed and what was its purpose in passing it? That intent and purpose we gather from the title to the act, which reads: "An act to establish and locate an additional state normal school at some suitable place as hereinafter provided and to provide for the erection of buildings, payment, maintenance and receiving donations for same, and to provide an appropriation therefor." That was what the legislature had in mind and what it purposed doing. Nebraska is a state of large dimensions. Its extreme length is 420 miles, extreme width 208 miles, and total area 77,520 square miles, of which 712 square miles only are water. Peru, the location of the first normal school, is in the southeast corner of the state, about 60 miles in an air-line from Lincoln, the capital of the state. Kearney, the location of the second normal school, is south

and a little east of the center of the state, 120 miles in an air-line from Lincoln. Chadron is in the northwest corner of the state, 355 miles in an air-line from Lincoln. From Chadron to Kearney, the location of the nearest normal school, is 250 miles in an air-line. These distances will show the reasons actuating the legislature in desiring to locate a third normal school in the northwestern portion of the state. While that portion of the state is more sparsely settled than the eastern and central portions, the people residing within the boundary described in the act are as much entitled to the benefit of state normal school privileges as the residents of other portions of the state; but their great distance from the other normal schools and the expense attendant upon sending their children to those schools have in many cases been prohibitive. In order to ameliorate their condition and to put them upon an equal footing with their more fortunate fellow citizens in the eastern and middle portions of the state, the legislature wisely and very justly provided by the act under consideration for a third normal school for their benefit. The purpose of the act under consideration, therefore, was the establishment of a normal school within the territory designated. That was the sole and controlling purpose; and, inasmuch as the legislature itself, while it might have located the school at a particular place, could not attend to all of the details of its location, that duty was naturally assigned to the school board. Believing at the time they passed that act that the act of April 1, 1909, was a valid act, and that the name of the board upon which would devolve the carrying into effect of the act it was then passing was the "Normal Board of Education," that name was used in the act. We think it would be trifling with the acts of the legislature for the court, on account of this nonessential mistake in denominating the board, to nullify the act and thereby prevent the carrying out of the wise and just purpose of the legislature. We are unwilling to do so.

It is further contended by plaintiff that neither board

visited any town, city or village competing for said place within ten days after September 1, 1909, or selected any site for said school from any of said competing places during the year 1909. The failure of the "Normal Board of Education" to act was entirely immaterial; and such failure on the part of the existing board did not in any manner affect the validity of its subsequent acts. The reason for its failure to act was the pendency of the suit of *State v. Majors,* and we think it was fully justified in awaiting the decision in that case before entering upon the work of selecting a site and contracting for the establishment of so important a state institution as a normal school. Time was not of the essence of the thing to be done. It was directory merely. It could not have been the intention of the legislature that, if the board for any reason was unable to visit the various cities and towns competing for the location of the school within the ten days, the act should fail. To illustrate: The act gave competing points until and including August 31, within which to file their applications. Six cities and towns had filed such applications. Others might have filed. Suppose applications had been filed on the last day of August and the board had started out on the morning of the next day to visit the several cities and towns for the purpose of examining the lands tendered and making an investigation of the situation and circumstances surrounding each application and the desirability of each competing point as a location for the school, and, by reason of the number of applicants and the distances between the several points, they were unable to complete the visitation and make a proper examination of each proposed site within the prescribed ten days, could it have been the intention of the legislature that they should either make a superficial examination only, or neglect entirely to visit some of the competing points? The mere statement of the proposition is its own answer. The authorities are numerous and uniform, as stated by Cooley, Constitutional Limitations (6th ed.) p. 92: "Those directions which are not of

the essence of the thing to be done, but which are given with a view merely to the proper, orderly, and prompt conduct of the business, and by a failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time or in the precise mode indicated, it may still be sufficient, if that which is done accomplishes the substantial purpose of the statute." In the case at bar, "the essence of the thing to be done" was the visiting of the competing points and the selection of a site for the school provided for in the act. The failure to make the visitation and selection within the time specified in the act did not prejudice the rights of any one, but when made at a later date "it accomplished the substantial purposes of the statute." We therefore hold that the defendant board had full power and authority to proceed under the act in question, to select a site and to take any and all other steps necessary to carry the act into effect.

Second. Did the Chadron Academy have authority to sell the land in question to the citizens of Chadron and to deed the same by their direction to the state? It is argued by plaintiff that the Chadron Academy was an eleemosynary institution, and held its property in trust, without any authority to sell and convey. In this contention we are unable to concur. The Chadron Academy was organized and incorporated in 1888, under chapter 16, Comp. St. 1887. Section 15 of that chapter reads: "Any number of persons, not less than five, desiring to establish a college, university, normal school, or other institution for the purpose of promoting education, religion, morality, agriculture or the fine arts, may, by complying with the provisions of this subdivision, become a body corporate and politic with perpetual succession, and may assume a corporate name by which they may sue and be sued, plead and be impleaded in all courts of law and equity; may have a corporate seal, and the same alter and break at pleasure; may hold all kinds of estate, real, personal or

mixed, which they may acquire by purchase, donation, devise, or otherwise, necessary to accomplish the objects of the incorporation, and the same to dispose of and convey at pleasure." This section has remained intact from the date of its first enactment to the present time, and still appears as section 15, ch. 16, Comp. St. 1909. At the beginning of the trial it was stipulated between the parties that the cause should be submitted to the court upon its merits "upon the pleadings, and the following instruments and evidence: First, the petition of the plaintiff; second, the affidavit of Luther P. Ludden to discharge the temporary restraining order, together with all the exhibits thereto annexed; third, the stipulation of the parties filed March 30, 1910, and the certified copy of a deed from Judson K. Deming and wife to the Chadron Academy." The stipulation filed March 30, referred to, provides: "That the following shall be deemed and taken as facts in addition to those embraced in the affidavits of the parties: That the Chadron Academy solicited and obtained written subscriptions by way of contributions from people of all denominations and of no denomination, which were given and paid in the treasury of the corporation without any written condition, trust, purpose or obligation, except that the same were to be used for the purposes of the corporation in purchasing land, erecting buildings, putting them up and supplying the school. That the Chadron Academy was a corporation formed without stock or stockholders, or dividends or gain." The deed from Deming and wife to the Chadron Academy, referred to in the stipulation, is an ordinary short-form warranty deed, and is made for a consideration of $3,200.

It will thus be seen that there is no foundation for plaintiff's second contention that "the land offered as a site belongs to an eleemosynary institution, holding title in trust, without any authority to sell and convey." There is nothing in the deed to the academy, nothing in the character of the donations it received, nothing in its articles of incorporation, nor anything in the statute which

forbids or even by implication prohibits the academy from selling the land in question, precisely as was done in this case. On the contrary, the authority is clearly given by the statute, "the same to dispose of and convey at pleasure." The corporation was formed by six resident freeholders of Dawes county, and the fact that in the articles of incorporation it was provided that their board of trustees were to be elected "by the Northwestern Association of Congregational Churches in Nebraska," is not sufficient to constitute it a sectarian or religious corporation; nor will the purposes to which the land will be appropriated, when it is used for a state normal school, be any violation or change of the purposes for which the corporation was formed, viz., "the promotion of Christian education by harmoniously developing the moral, mental and physical powers of those who share its advantages." This is a Christian country, Nebraska is a Christian state, and its normal schools are Christian schools; not sectarian, nor what would be termed religious schools; nor was the Chadron Academy such a school. The Chadron Academy had full authority to sell and convey the land, as proposed; and in so doing it will not be causing it to be devoted to any other or different purpose than that for which it was used while still held by it. Instead of being a detriment to those attending the school, the change will be of incalculable benefit to them. The Chadron Academy, as the record shows, has never paid its way. The establishment of the normal school at Chadron and the taking of the land off its hands and devoting it to educational purposes, under the laws of the state, will be a godsend to it. At the time these negotiations began, its indebtedness had steadily increased to a total of about $17,000, the principal part of which seems to have been represented by a mortgage given to a church extension society. The consideration paid by the citizens of Chadron was $7,000, which sum the extension society agreed to accept and release its mortgage, thus satisfying the debt. The academy seems therefore to have been con-

tinuing its operations by the grace of its creditors, and it is a fair presumption that in its encumbered condition it could not provide its students with anything like the advantages or facilities for "harmoniously developing the (their) moral, mental and physical powers," as. will be afforded them by a normal school endowed with the wealth of a great state.

In *People v. President and Trustees of the College of California,* 38 Cal. 166, the supreme court of California had before it a case substantially on all fours with the case at bar. In the syllabus it is held: "All corporations capable of taking and holding property have the *jus disponendi* as fully as natural persons, except so far as they are restrained by statute. Under this general power, a corporation may dispose of the whole of its property for any lawful purpose. * * * It was for the president and trustees of the College of California to decide whether the public interest would be subserved by dissolving the corporation and devoting its property, after the payment of its debts, to the support of the state university." The opinion of the court, by Crockett, J., contains so much discussion applicable to the case at bar that we will not weaken the opinion by quotations therefrom, but refer to it as a clear and able discussion of the question under consideration here. It is so clearly in point and its reasoning appears to us so sound that we refrain from further citations. Without further discussion of the sub-- ject, we hold that the Chadron Academy had full power and authority to sell and convey the land in controversy for the purposes for which such sale was made.

Third. Under this assignment it is contended that the appellees selected the site, chose an architect, approved his plan for a building, and appropriated $30,000 for its erection before the title was approved or passed upon by the attorney general. It is true that the defendant board selected the site and chose an architect, but the evidence does not sustain the charge that defendant board had approved the architect's final plans for a building or that it

had appropriated $30,000 for its erection. The proceedings of the board, which are introduced in evidence, show that the board received bids from several architects for the new normal building at Chadron and the administration building at Peru; that the bids of Mr. Bair and Mr. Berlinghof were identical; whereupon a motion was duly made, seconded and adopted, "that the board accept the offer of Mr. Berlinghof." At the next meeting of the board the minutes recite: "Mr. Berlinghof presented the preliminary studies for the new building at Chadron. After considering the same, Mr. Ludden moved and Mr. Brian seconded: That the studies as presented be approved and that the architect be instructed to prepare plans in accordance therewith." So far as the evidence before us shows, this is the limit to which the board had gone in approving plans for a building. As to the charge that the board had appropriated $30,000 for the erection of the building, the record stands thus: By section 4 of the act under which the board was proceeding, the legislature appropriated the sum of $35,000, or so much thereof as might be necessary for the purpose of carrying into effect the provisions of the act. At a meeting of the board on February 8, 1910, we have this record: "Mr. Ludden moved and Mr. Bishop seconded: That the blank for the amount of the cost of the building at Chadron be filled in at $30,000. The motion was adopted." By this action all that the board did was to determine that they would use only $30,000 of the $35,000 appropriated by the legislature, for the construction of a building at Chadron. The fact that the board took the preliminary steps above outlined before the attorney general had passed upon the abstracts was not sufficient to warrant plaintiff in bringing this suit. They had not yet actually appropriated the $30,000, but had simply designated that as the amount beyond which they would not go, and so that the board would have a standard by which to guide the architect in the preparation of his final plans and specifications, and to guide the board itself in calling for bids thereupon and

in ultimately letting the contract for the construction of the building. No fraud or bad faith on the part of the board is urged.

Upon consideration of the whole case we hold that, if the title to the land tendered receives the approval of the attorney general, the defendant board may lawfully proceed with the establishment of a normal school at Chadron and the erection of suitable buildings therefor, in accordance with the act of April 5, 1909, *supra*.

The judgment of the district court is therefore

AFFIRMED.

REESE, C. J., not sitting.