Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/04/2023 01:08 AM CDT

State of Nebraska, appellee, v. Christopher
X. Brennauer, appellant.
___ N.W.2d ___

Filed July 28, 2023.    No. S-21-642.

1. **Appeal and Error.** Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error.

2. ____. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

3. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

4. ____: ____. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

5. **Constitutional Law: Trial: Jury Instructions: Evidence.** The Nebraska Constitution guarantees a fair and impartial trial to every citizen of this state, and this demands that, in the consideration of the evidence, the jury must be guided in its deliberations by a correct statement of the law.

6. **Jury Instructions: Pleadings: Evidence.** Whether requested to do so or not, a trial court has the duty to instruct the jury on issues presented by the pleadings and the evidence, and it must, on its own motion, correctly instruct on the law.

7. **Appeal and Error.** Where a determination is necessary to a reasonable and sensible disposition of the issues presented, an appellate court is required by necessity to notice plain error based on the theory of the case as tried.

8. **Criminal Law: Jury Instructions.** As a general rule, when instructing the jury, it is proper for the court to describe the offense in the language of the statute.

9. **Criminal Law: Insanity: Proof.** The insanity defense requires proof that (1) the defendant had a mental disease or defect at the time of the crime and (2) the defendant did not know or understand the nature and consequences of his or her actions or that he or she did not know the difference between right and wrong.

10. **Criminal Law: Insanity: Intoxication.** Settled insanity produced by intoxication affects criminal responsibility in the same way as insanity produced by any other cause.

11. **Statutes.** Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.

12. **Statutes: Appeal and Error.** An appellate court will not resort to interpretation of statutory language to ascertain the meaning of words which are plain, direct, and unambiguous.

13. **Statutes: Legislature: Intent.** In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.

14. ____ : ____ : ____. In order for a court to inquire into a statute's legislative history, that statute in question must be open to construction, and a statute is open to construction when its terms require interpretation or may reasonably be considered ambiguous.

15. **Insanity: Intoxication.** Voluntary intoxication is not a mental disease or defect for the purpose of the insanity defense.

16. **Criminal Law: Proximate Cause.** A requirement of proximate cause serves to preclude criminal responsibility in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.

17. **Criminal Law: Insanity: Intoxication.** Neb. Rev. Stat. § 29-2203(4) (Reissue 2016) codified Nebraska's longstanding precedent that a mental disease or defect does not include voluntary intoxication, and a defendant's loss of capacity that was immediately produced by intoxication does not excuse criminal responsibility if the accused became voluntarily intoxicated.

18. **Jury Instructions: Evidence: Appeal and Error.** When examining for harmless error, the court may look at a variety of factors, including the jury instructions as a whole, the evidence presented at trial, and the closing arguments.

19. **Jury Instructions: Verdicts.** The purpose of instructions is to furnish guidance to the jury in its deliberations and to aid it in arriving at a proper verdict; and, with this end in view, the jury instructions should

state clearly and concisely the issues of fact and the principles of law that are necessary to enable them to accomplish the purpose desired.

20. **Jury Instructions: Appeal and Error.** A jury instruction that misstates the issues and has a tendency to confuse the jury is erroneous.

21. **Jury Instructions.** The language used in jury instructions should be adapted to the understanding of the jury to which it is directed, and it should be as clear as possible.

22. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Lancaster County: Ryan S. Post, Judge. Judgment reversed, convictions and sentences vacated, and cause remanded for a new trial.

Kristi J. Egger, Lancaster County Public Defender, and Shawn Elliot for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Per Curiam.

## INTRODUCTION

Christopher X. Brennauer appeals from his convictions and sentences on four felony charges after a trial by jury where he raised a defense of not responsible by reason of insanity. At trial, Brennauer's insanity defense presented a question of law that we have not previously considered: the effect of Neb. Rev. Stat. § 29-2203(4) (Reissue 2016) on the insanity defense. We conclude that § 29-2203(4) does not affect our precedent regarding settled insanity. In light of our interpretation, the jury was not properly instructed, given the manner that the State presented evidence and argued in closing. Consequently, we notice plain error in the jury instructions and conclude that reversal is necessitated. Therefore, we

reverse the district court's judgment, vacate Brennauer's convictions and sentences, and remand the cause for a new trial.

## BACKGROUND

Brennauer's charges related to a single event that occurred on December 29, 2018, arising from a 911 emergency dispatch service call from Brennauer's girlfriend in which she reported that Brennauer was mentally ill and threatening self-harm with a knife. When police attempted to take Brennauer into emergency protective custody,[1] he resisted, resulting in an officer receiving a stab wound and Brennauer receiving two gunshot wounds to his back.

*Brennauer's Mental Health History.*

Brennauer's mental health symptoms began when he was a child, and he was first hospitalized when he was 12 years old. At that time, Brennauer was not prescribed medication and received no further treatment. He was again hospitalized in his early twenties, where he received a series of diagnoses, including schizophrenia, schizoaffective disorder, and bipolar disorder. Brennauer's records suggest that his psychotic symptoms worsened following substance use in his teens and early twenties, and that he was diagnosed with polysubstance use disorders and substance-induced psychotic disorder.

In 2003, Brennauer was found not responsible by reason of insanity for a charge of attempted robbery. He was hospitalized at the Lincoln Regional Center (Regional Center). Brennauer suffered from psychotic symptoms, including paranoia and delusions. He believed others could hear his thoughts and that the Mafia and the Federal Bureau of Investigation were after him. He experienced auditory hallucinations and would be consumed by negative thoughts. Brennauer's symptoms improved with treatment and medication, which led to his discharge from the Regional Center into CenterPointe's Dual Diagnosis Residential Program in 2011.

---

[1] See Neb. Rev. Stat. § 71-919 (Reissue 2018).

In 2013, Brennauer was rehospitalized at the Regional Center when he violated the conditions of his treatment plan by failing to take his medications as prescribed and by using illicit substances. He was again discharged from the Regional Center and into the residential program in 2017. He completed and was discharged from the residential program later that year.

In 2018, Brennauer attempted suicide in April and again in July. Subsequently, he was committed to intensive outpatient treatment and was placed on a waiting list for the residential program. While on the waiting list, Brennauer lived in an apartment with his girlfriend, but due to his deteriorated mental health, he was unable to get dressed, work, or even remember where things were located. In addition to his prescribed oral antipsychotic and antidepressant medications, Brennauer was receiving an injectable antipsychotic every 3 months, administered by medical professionals. Throughout 2018, Brennauer used methamphetamine, alcohol, and cannabis.

Before trial in this case, the State filed a motion in limine to preclude any evidence of Brennauer's prior not responsible by reason of insanity verdict. The State argued that such evidence would prejudice the State's case because the issue was whether Brennauer was legally insane at the time of the offenses and not whether Brennauer was insane at any other time. The district court granted the State's motion.

*December 29, 2018.*

Brennauer was still on the waiting list for the residential program when he again became suicidal in the early hours of December 29, 2018. The day before, Brennauer had received an injection of his slow-acting antipsychotic medication, which was administered over 2 weeks late. He had last used methamphetamine 2 days prior and ingested two shots of alcohol earlier that night. Brennauer was at home with his girlfriend and a neighbor when he began threatening self-harm with a knife. His girlfriend called 911 when Brennauer began holding the knife to his own throat.

Three officers arrived on the scene, and Brennauer's girl-friend informed them that Brennauer was a paranoid schizo-phrenic, was "not doing well," posed a danger to himself, and had been holding a knife to his neck. She invited the officers into the apartment, telling them that Brennauer was "not well" and that Brennauer needed to go to the Lancaster County Crisis Center for medical care.

When the three officers entered the apartment, Brennauer became agitated. He said he was "not going nowhere" and repeatedly requested that the officers leave his home. Brennauer's girlfriend pleaded with him to cooperate with the officers and repeatedly told him they would help him. The officers proceeded to question Brennauer as to whether he had a knife and the knife's location. While questioning Brennauer, two of the officers had drawn their Tasers, while a third had drawn his handgun. The officers pointed their weapons at Brennauer at various times throughout this encounter. During this time, two additional officers arrived on the scene.

Brennauer's girlfriend and his neighbor were sequestered in the apartment's living room, away from Brennauer, and were questioned by two of the five officers now in the apart-ment. Brennauer's girlfriend confirmed that Brennauer had earlier had a paring knife against his neck and that her hand had been cut when she attempted to take the knife away from him. The neighbor mentioned that Brennauer "flipped," while Brennauer's girlfriend informed officers that Brennauer had missed his injection of antipsychotic medication and that "he's been really out there," "he's really really sick," and "he's definitely delusional." She informed officers that at times, Brennauer thought vampires were eating him. While not entirely audible on the police-recorded audio, it seems she informed the officers that Brennauer was wiping mustard on his face in an attempt to get his face to shine.

Meanwhile, the other three officers continued question-ing Brennauer, attempting to discern whether Brennauer still possessed a knife and where it was located. At this time,

Brennauer was located in a small space between the apartment's living room and kitchen. Brennauer clutched a book in his hands, which at least one witness testified was a Bible. Brennauer was primarily communicating with one officer and began to calm down and cooperate with this officer, who had put his Taser away. Brennauer asked to shake this officer's hand, but the officer declined the handshake and instead gave Brennauer a "fist bump."

Based on the information from Brennauer's girlfriend and his neighbor, one officer decided that Brennauer would be taken into emergency protective custody. He signaled the other officers to take Brennauer into custody. When the officer communicating with Brennauer received the signal, he apologized to Brennauer for not shaking hands earlier because he felt that he had disrespected Brennauer. The officer offered to shake Brennauer's hand. The officer intended to shake Brennauer's hand to pull Brennauer forward, out of the small enclosed space, and into the kitchen where there was more room to take Brennauer to the ground for the purpose of taking him into custody.

When the officer attempted to pull Brennauer forward, Brennauer pulled backward, and their hands separated. The officer proceeded to move toward Brennauer in an attempt to regain control. At this time, Brennauer, with the knife now in his hand, attempted to bring the knife down to stab the officer, who repeatedly blocked Brennauer's stabbing motions. One of the other officers charged Brennauer in an effort to restrain him and received a stab wound to his upper right chest. Upon being stabbed, the officer drew his handgun and fired three times. The first shot struck the leg of the officer who was communicating with Brennauer, and the second and third shots struck Brennauer in the back. Two of the three officers deployed their Tasers into Brennauer. At the end of the fray, Brennauer was in custody and he and the two injured officers were being transported for medical assistance.

*Brennauer's Hospital Stay.*

Brennauer underwent surgery related to the two gunshot wounds he had sustained. While recovering in the hospital, Brennauer had one of his ankles and one of his wrists cuffed to the hospital bed. The Lincoln Police Department provided 24-hour "scene security," whereby officers rotated in 2-hour shifts to watch Brennauer. During his time in the hospital, Brennauer made statements that were the subject of a pretrial "Motion to Suppress and Jackson v. Denno hearing." Brennauer argued that these statements were inadmissible under the Due Process Clause because they were involuntarily made, made in violation of his *Miranda* rights, or both. The district court denied Brennauer's motion.

Three officers testified both at the hearing and at trial. These officers testified that they were instructed to note any statements that Brennauer made and, if relevant to the case, write the statements into additional case information reports. On three occasions while medical staff was treating or aiding Brennauer, he made statements that were documented by these officers. None of the officers' reports recorded the medical staff present at the time of the statements. None of the officers could recall any of the statements made by medical staff, knew any of the medications Brennauer may have been administered, or knew what occurred in Brennauer's hospital room before they arrived or after they left. All three officers testified that they did not read Brennauer his *Miranda* rights and did not elicit any of the statements from Brennauer.

Officer Erin Spilker testified that she provided scene security on the afternoon of January 9, 2019. When medical staff was placing a catheter and changing Brennauer's feeding tube, Brennauer said that he had been shot in the back and that therefore, the catheter being placed was not going to be painful for him. Brennauer then said to the room that "he never should've stabbed that cop" and that "he thought they would tase him and that they wouldn't shoot him." Spilker testified that Brennauer then asked her how long he was going to be

in prison and that he knew he was going to prison for a long time, but he "wanted the ability to eat a meal." Spilker did not recall whether there was any indication that Brennauer was confused, but she felt like Brennauer was coherent.

Officer Patrick Sullivan testified that he provided scene security in the early evening of January 9, 2019. Sullivan testified that Brennauer was "kind of in and out. Loopy most of the time." Brennauer was "sleeping a lot on and off" and "was a little bit out of it." Sullivan recounted that Brennauer woke up and asked to use the restroom. When nurses came to help Brennauer, he stated, "I stabbed a cop I guess," and after a slight pause, "I told her not to call the cops." Sullivan "was not sure who he was saying [the statements] to in general. If he was just saying them out loud or to the nurses," he did not know. Sullivan testified that Brennauer spoke with "kind of an upset tone."

Officer Alessandra Winterbauer testified that she provided scene security on January 10, 2019. When Brennauer requested to go from the hospital bed to a small chair next to it, Winterbauer removed Brennauer's restraints from the bed and re-restrained him to a chair. Winterbauer testified that when moving Brennauer, he asked, "I didn't hurt that guy did I?" Then Brennauer asked if Winterbauer knew how much time he was going to get. Winterbauer did not remember what Brennauer's demeanor was like or his speech, only that he moved slowly between the bed and the chair and that there was no indication Brennauer was confused.

At the hearing, but not at trial, Brennauer called an occupational therapist who worked at the hospital and worked with Brennauer on January 7, 8, 9, and 10, 2019. On each of these days, the therapist recorded Brennauer's cognitive status as "impaired" as opposed to "within functional limits." She testified that on January 7, Brennauer "required additional queuing [sic] to follow commands" and that when asked questions, Brennauer's answers would not make sense or would be out of context. On January 8, Brennauer needed cues "to make

sure he was close enough to a seated surface before he sat down so he wouldn't fall to the floor."

The therapist testified that on January 9, 2019, Brennauer was singing "songs that did not make sense," which was something not typically seen in other patients. Brennauer's speech was not understandable because his speech was slurred and because the words did not make sense. Then on January 10, Brennauer was displaying "socially inappropriate behavior" and was "not acting in a way that was typically appropriate in a hospital setting," and some verbalization that Brennauer made during the session would not be appropriate for what they were working on. For example, the therapist could not understand something Brennauer said, and when she asked for clarification, Brennauer stated that he was "making slurs about Italians." The statements were not in context with what they were talking about or working on. She never thought Brennauer's cognition was within functional limits during this time period.

*Expert Opinions on Insanity.*

As to Brennauer's defense of not responsible by reason of insanity, experts for both Brennauer and the State agreed that Brennauer had a mental disease during the events at issue occurring on December 29, 2018. The experts agreed that Brennauer suffered from schizoaffective disorder-bipolar type, various substance use disorders, and an antisocial personality disorder. They also agreed that at the time of the incident, Brennauer was psychotic with mood lability and experiencing delusions and paranoia, and that Brennauer did not remember the incident. However, the experts disagreed on the cause of Brennauer's memory loss and whether Brennauer knew or understood the nature and consequences of his actions or knew the difference between right and wrong.

Dr. Robert Arias, Brennauer's expert, is a neuropsychologist specializing in the relationship between brain functioning and behavior. Arias' opinion was that on December 29,

2018, Brennauer did not understand the nature and consequences of his actions or that he did not know the difference between right and wrong. Arias testified that Brennauer was in a severely decompensated psychiatric state and suffering from symptoms of psychosis, particularly disorganized thinking. Arias testified that because Brennauer was late in receiving his antipsychotic injection, it would be expected that Brennauer would have emerging psychiatric symptoms. Even though Brennauer had received the medication the day before the incident, it was not fast acting and might take weeks to reach a therapeutic level.

In Arias' opinion, Brennauer's memory loss was both a result and an indication of his psychosis. Arias contended that the statements Brennauer made in the hospital, when he was in a calmer state and receiving his proper regime of psychotropic medications, showed that Brennauer was trying to process the consequences of his actions and indicated that he did not understand the nature and consequences of his actions or that he did not know the difference between right and wrong at the time of the incident.

Dr. Jennifer Cimpl Bohn, the State's expert, is a licensed psychologist who primarily conducts court-ordered evaluations. Cimpl Bohn acknowledged that Brennauer has a mental disease and was having specific delusions around the time of the incident. Those delusions included that Brennauer "thought that Osama Bin Laden was somehow involved in a conspiracy that involved people across the United States being fed gasoline" and that he "thought people were trying to collect oxytocin from his body to benefit the one percenters." She also acknowledged that Brennauer's delusional state and symptoms were "pretty consistent" for several months before the incident.

It was Cimpl Bohn's opinion that Brennauer likely understood the nature and consequences of his actions and knew the difference between right and wrong at the time of the incident. Cimpl Bohn pointed to Brennauer's conversation

with the officers in his home and contended that it showed Brennauer's delusions and hallucinations did not interfere with his ability to communicate. She noted that Brennauer wanted the officers to leave and did not want to go to jail, which displayed reality-based concerns. Cimpl Bohn also pointed to the statements Brennauer made in the hospital and contended they proved he understood the consequences of his actions.

Cimpl Bohn believed the most likely explanation for Brennauer's memory loss was a repressed memory due to a traumatic experience because of a lack of history of memory loss and the specific timeframe that Brennauer could not remember. In Cimpl Bohn's opinion, someone could understand the difference between right and wrong and still repress a memory thereafter.

*Expert Opinions on Intoxication.*

After each expert testified to their respective opinions regarding Brennauer's insanity, the State questioned the witnesses on topics related to § 29-2203(4).

For example, the State acknowledged that, in Arias' opinion, Brennauer's medical records indicated that his mental state was "going downhill." The State then engaged in the following exchange with Arias:

Q Okay. And that . . . was in part because he wasn't taking his mental health medication?

A Yes.

Q And in part, because of his substance use?

A That can exacerbate that, yes.

Q Is it your understanding, . . . that Nebraska law indicates that insanity does not include any temporary condition that was approximately caused by the voluntary ingestion, inhalation, or absorption of intoxicating liquor, any drug or other mentally debilitating substance or any combination thereof?

A Yes.

The State then proceeded to question Arias on Brennauer's prior suicide attempts, the two shots of alcohol he consumed before the police were called to his home, that he used a quarter gram of methamphetamine 2 days prior, and the effects of methamphetamine.

Arias rejected the State's suggestion that Brennauer was in a methamphetamine-induced psychosis. He noted that methamphetamine's effect typically lasts only a number of hours due to the drug's half-life and that based on the amount Brennauer was using, methamphetamine would not be expected to have caused symptoms of psychosis such as those Brennauer was experiencing at the time of the incident. The fact that Brennauer did not remember the incident indicated to Arias that Brennauer was in an acutely decompensated psychotic state, particularly where no other cause, such as memory repression, could explain Brennauer's irrational conversations with the officers.

Cimpl Bohn testified that when the incident occurred, Brennauer would not have been so intoxicated that he would not have a memory of the incident. When pressed by the State, she conceded that intoxication could not be "rule[d] out entirely" as the reason for Brennauer's memory loss.

Cimpl Bohn expounded on her awareness of Brennauer's history of substance use, particularly his methamphetamine use, and Brennauer's history of noncompliance with his psychotropic medications. She discussed methamphetamine psychosis, as well as methamphetamine withdrawal symptoms, and stated that methamphetamine psychosis resolves when the drug is no longer in a person's system. Cimpl Bohn referenced the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, which notes that methamphetamine-induced psychosis can last weeks to months. She pointed out that Brennauer was listed as psychiatrically stable on January 16, 2019, when he arrived at the jail, which was after the methamphetamine cleared from his system. She acknowledged that Brennauer received psychotropic medications from

when he was taken into custody to when she evaluated him weeks later.

Cimpl Bohn testified that she was unable to speak about how the antipsychotic medications and the timing of their effectiveness would affect Brennauer specifically, and she could testify only to the difficulty in parsing out the cause of symptoms. She stated that she was not an expert on pharmacology and that a psychopharmacologist would be needed to speak on that issue. Cimpl Bohn testified that she could not speak to the degree that Brennauer's substance use contributed to his symptoms in the days leading up to and including the night of the incident.

However, Cimpl Bohn stated that Brennauer's medical records are "pretty clear" that his methamphetamine use exacerbated the symptoms of his schizoaffective disorder. She later suggested that Brennauer's symptoms of "racing thoughts, auditory hallucinations, paranoia, delusional ideas, and bizarre ideas" resulted from his substance use. Cimpl Bohn never offered an opinion as to whether Brennauer experienced a temporary condition that was proximately caused by his voluntary intoxication.

*State's Closing Argument.*

In its closing argument, the State addressed Brennauer's insanity defense and his memory "blackout" of the incident. The State told the jury that it would be instructed that to prove the insanity defense, Brennauer needed to prove by the greater weight of the evidence that he had a mental disease that impaired his mental capacity to such an extent that he either did not understand the nature and consequences of what he was doing or did not know the difference between right and wrong. The State emphasized that insanity does not include any temporary condition that was proximately caused by voluntary intoxication.

The State pointed out that it was undisputed that Brennauer had a mental disease and that Brennauer did not remember

the incident. The State reviewed Cimpl Bohn's belief that Brennauer's memory loss was due to memory suppression and argued to the jury that his memory loss was not due to his diagnosed mental health conditions. The State conceded that Brennauer's memory loss was "probably not" caused by his substance use. Still, it reminded the jury that Cimpl Bohn stated it could not be ruled out completely. The State emphasized, "[a]gain, if that's the proximate cause then that can't be a basis, the substances, if that's the proximate cause can't be a basis for — for a cognitive insanity."

*Jury Instructions.*

The jury was charged with determining Brennauer's criminal responsibility on four counts. The jury was instructed:

> Mr. Brennauer has pled not guilty and raised the defense of not responsible by reason of insanity to all counts. He is presumed to be innocent. If the State fails to prove each element of a crime beyond a reasonable doubt then you must find the defendant not guilty. If the State has proven each element of a crime beyond a reasonable doubt[,] then you must consider Mr. Brennauer's defense of not responsible by reason of insanity. If Mr. Brennauer proves by the greater weight of the evidence that he was not sane at the time the crime was committed[,] then you must find him not responsible by reason of insanity.

As to each of the four counts, the jury was instructed:

> The burden of proof is always on the State to prove beyond a reasonable doubt the material elements of the crime charged and this burden never shifts. . . . If the State did so prove, then you must go on to consider Christopher Brennauer's defense that he was insane at the time he committed [each crime].
>
> . . . .
>
> The defense of insanity has two elements. These are:

(1) That Christopher Brennauer had a mental disease at the time of the acts charged; and

(2) That this mental disease impaired his mental capacity to such an extent that either:

(i) he did not understand the nature and consequences of what he was doing; or

(ii) he did not know the difference between right and wrong with respect to what he was doing.

The jury was instructed that Brennauer had to "prove both elements of the insanity defense by the greater weight of the evidence" and that if the jury decided he did, it "must find him not responsible by reason of insanity. Otherwise, you must find him guilty."

At the request of the State, the jury received instruction No. 6, which was virtually identical to the language of § 29-2203(4): "Insanity does not include any temporary condition that was proximately caused by the voluntary ingestion, inhalation, injection, or absorption of intoxicating liquor, any drug or mentally debilitating substance, or any combination thereof."

At the jury instruction conference, Brennauer objected to instruction No. 6 because "both experts negated that or indicated that, that was not a contributing factor." Brennauer also contended that if the court gave instruction No. 6, an instruction defining proximate cause was needed "because then the burden is on the State to prove proximate cause."

In response, the State contended that the burden was on the defense with respect to the insanity defense and proposed omitting language from Brennauer's proposed definition of proximate cause that would "imply[] that the State has to establish that proximate cause." Brennauer countered that the State was introducing "the concept" that the voluntary ingestion of substances caused a temporary condition that would negate his defense, and thus, the burden of proof should be on the State.

The district court ruled that the jury would be instructed on proximate cause as proposed by Brennauer and amended by the State. Accordingly, instruction No. 7 stated:

A proximate cause is one that produces a result in a natural and continuous sequence and without which the result would not have occurred. Proximate cause has three requirements:

(1) Without the action, the result would not have occurred, commonly known [as] the "but for" rule;

(2) The result was a natural and probable result of the action; and

(3) There was no efficient intervening cause.

*Verdicts and Sentencing.*

The jury found Brennauer guilty on all counts. The district court sentenced Brennauer to terms at the Department of Correctional Services of 2 to 4 years' imprisonment for possession of a deadly weapon by a prohibited person, a Class III felony[2]; 25 to 35 years' imprisonment for second degree assault on an officer, a Class II felony[3]; 20 to 25 years' imprisonment for first degree attempted assault on an officer, a Class II felony[4]; and 10 to 15 years' imprisonment for use of a deadly weapon to commit a felony, a Class II felony.[5] All sentences were ordered to run consecutively. In total, Brennauer was sentenced to not less than 57 nor more than 79 years' imprisonment.

## ASSIGNMENTS OF ERROR

Brennauer assigns the district court erred by (1) overruling Brennauer's motion to suppress and admitting statements

---

[2] See Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2022).

[3] See Neb. Rev. Stat. § 28-930 (Cum. Supp. 2022).

[4] See Neb. Rev. Stat. §§ 28-201 (Reissue 2016) and 28-929 (Cum. Supp. 2022).

[5] See Neb. Rev. Stat. § 28-1205 (Reissue 2016).

Brennauer made at his home and in the hospital and (2) sustaining the State's motion in limine regarding Brennauer's prior not responsible by reason of insanity finding. Further, Brennauer assigns that (3) the evidence adduced at trial was insufficient to sustain Brennauer's convictions and (4) the sentences imposed by the district court are excessive and constitute an abuse of discretion.

## STANDARD OF REVIEW

[1,2] Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error.[6] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[7]

[3,4] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[8] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[9]

## ANALYSIS

We begin with Brennauer's third assignment of error, that the evidence adduced at trial was insufficient to sustain his convictions. In support of this assignment, Brennauer argues that the State presented insufficient evidence to rebut his showing that he was not responsible by reason of insanity. Both his argument and the State's response implicate Brennauer's history of substance abuse, which requires us to

[6] *State v. Clausen*, 307 Neb. 968, 951 N.W.2d 764 (2020).

[7] *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

[8] *State v. Fernandez*, 313 Neb. 745, 986 N.W.2d 53 (2023).

[9] *Id.*

consider, for the first time, the effect of § 29-2203(4) on the insanity defense.[10] Because the parties did not specifically address the effect of § 29-2203(4) in their initial briefing on appeal, we ordered supplemental briefing after oral argument. The parties filed supplemental briefs, which we have considered.

*Parties' Arguments.*

At trial, the State did not contest that Brennauer was entitled to a jury instruction on the insanity defense. However, the State requested an instruction be given mirroring the language of § 29-2203(4), which the jury received as instruction No. 6: "Insanity does not include any temporary condition that was proximately caused by the voluntary ingestion, inhalation, injection, or absorption of intoxicating liquor, any drug or mentally debilitating substance, or any combination thereof." Brennauer objected to the giving of instruction No. 6 at trial, but he does not assign the giving of such instruction as error on appeal.

[5-7] However, the Nebraska Constitution guarantees a fair and impartial trial to every citizen of this state, and this demands that, in the consideration of the evidence, the jury must be guided in its deliberations by a correct statement of the law.[11] Accordingly, whether requested to do so or not, a trial court has the duty to instruct the jury on issues presented by the pleadings and the evidence, and it must, on its own motion, correctly instruct on the law.[12] Likewise, where a

---

[10] See, *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020); *State v. Bigelow*, 303 Neb. 729, 931 N.W.2d 842 (2019).

[11] *Kennison v. State*, 80 Neb. 688, 115 N.W. 289 (1908). See Neb. Const. art. I, § 11. See, also, *State v. Edwards*, 286 Neb. 404, 837 N.W.2d 81 (2013).

[12] See, Neb. Rev. Stat. § 25-1111 (Reissue 2016); *State v. Kipple*, 310 Neb. 654, 968 N.W.2d 613 (2022); *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004); *State v. Adams*, 251 Neb. 461, 558 N.W.2d 298 (1997). See, also, *State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978); *Metz v. State*, 46 Neb. 547, 65 N.W. 190 (1895).

determination is necessary to a reasonable and sensible dis-
position of the issues presented, we are required by necessity
to notice plain error based on the theory of the case as tried.[13]
Because the effect of § 29-2203(4) was necessary to the dis-
position of the issues presented to the jury, we are required by
necessity to consider its effect and determine whether instruc-
tion No. 6 and Brennauer's requested instruction No. 7 defin-
ing proximate cause were plain error.

[8] We note that since we have not had the opportunity
before now to address the effect of § 29-2203(4) on the insan-
ity defense, the district court did not have the benefit of our
guidance regarding § 29-2203(4) when it instructed the jury.
As a general rule, when instructing the jury, it is proper for the
court to describe the offense in the language of the statute.[14] In
light of the State's request for the instruction, the district court
did not err under this general rule.

However, while instruction No. 6 mirrored the language of
§ 29-2203(4) and was a correct statement of law in isolation,
Brennauer argues that reversal is nevertheless necessary. He
asserts that the State "complicated the issue" presented to the
jury by the evidence it adduced from the expert witnesses and
by its closing argument such that the jury was confused.[15] He
points out, for example, that the State suggested to the jury
in its closing argument that the jury could not find Brennauer
was insane if it found that Brennauer's memory loss of the
incident was due to his intoxication, which could not be ruled
out completely.

---

[13] See, *State v. Conover*, 270 Neb. 446, 703 N.W.2d 898 (2005); *State v. Goodseal*, 186 Neb. 359, 183 N.W.2d 258 (1971); *State v. Majors*, 85 Neb. 375, 123 N.W. 429 (1909). See, also, *State v. Johnson*, 269 Neb. 507, 695 N.W.2d 165 (2005); *State v. Hert*, 192 Neb. 751, 224 N.W.2d 188 (1974).

[14] See, *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016); *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015).

[15] Supplemental brief for appellant at 18.

The State argues that sufficient evidence supports the jury's rejection of Brennauer's insanity defense because "even though the experts agreed that Brennauer had a mental disease at the time of the offenses," they did not agree as to whether Brennauer suffered a lack of capacity.[16] The State contends that reversal is unnecessary because the evidence undisputedly showed that Brennauer's "mental condition" at the time of the offense was a temporary condition proximately caused by his intoxication.[17] As it states, "[T]he trial evidence was undisputed that over the course of more than a year leading up to the offenses in this case, Brennauer voluntarily ingested marijuana, methamphetamine, and alcohol."[18] The State continues:

> Although Brennauer was not intoxicated at the time of his crimes, the evidence at trial was that his delusional psychiatric condition at that time was temporary and proximately caused by Brennauer's voluntary ingestion, inhalation, injection, or absorption of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof. Indeed, this is the only conclusion a reasonable jury could reach because it was undisputed at trial that Brennauer's voluntary use of substances both initiated, and exacerbated or worsened, his delusional psychiatric mental condition upon which he relies for his insanity defense. Such a condition was also a natural and probable result of substance use, particularly his chronic use of methamphetamine, and there was no efficient intervening cause. Therefore, Brennauer's use of substances was a proximate cause of his mental condition. Moreover, it was a temporary condition because he was psychiatrically stable in 2017, before he began using

---

[16] Brief for appellee at 49.

[17] Supplemental brief for appellee at 11.

[18] Supplemental brief for appellee at 9-10.

substances, and less than three weeks after the offense, having been deprived of his use of substances, Brennauer was no longer in a delusional psychiatric state.[19]

However, if taken to its logical conclusion, the essence of the State's argument is that the undisputed evidence shows Brennauer was not entitled to an instruction on the insanity defense. Based on our review of the record, we cannot agree with that conclusion.

*Intoxication and Settled Insanity.*

[9] The insanity defense developed early at common law, and Nebraska formally adopted the *M'Naghten*[20] rule of insanity in 1876, which recognizes that "where an individual lacks the mental capacity to distinguish right from wrong, in reference to the particular act complained of, the law will not hold him [or her] responsible."[21] Accordingly, in Nebraska, the insanity defense requires proof that (1) the defendant had a mental disease or defect at the time of the crime and (2) the defendant did not know or understand the nature and consequences of his or her actions or that he or she did not know the difference between right and wrong.[22] To be found not responsible by reason of insanity, the insanity must be shown to exist at the time of the offense charged.[23]

The State's argument reads the "temporary condition" within § 29-2203(4) to affect the second prong of the insanity defense, the defendant's lack of capacity, rather than the first, whether the defendant suffered from a mental disease.

---

[19] Supplemental brief for appellee at 11.

[20] *M'Naghten's Case*, (1843) 8 Eng. Rep. 718, 10 Cl. & Fin. 200.

[21] *Wright v. The People*, 4 Neb. 407, 409 (1876). See *State v. Hotz*, 281 Neb. 260, 795 N.W.2d 645 (2011).

[22] *State v. Johnson*, 308 Neb. 331, 953 N.W.2d 772 (2021).

[23] *State v. Carr*, 231 Neb. 127, 435 N.W.2d 194 (1989); *Bothwell v. State*, 71 Neb. 747, 99 N.W. 669 (1904).

Under the State's interpretation of § 29-2203(4), a successful insanity defense is precluded when any voluntary use of intoxicating substances led to the defendant's lack of capacity. But the State's argument overlooks our longstanding precedent that distinguishes "temporary insanity" from "settled insanity."

We have long held that voluntary intoxication is not a complete defense to a crime, even when it produces psychosis or delirium.[24] A defendant's loss of capacity that was immediately produced by intoxication does not excuse criminal responsibility if the accused became voluntarily intoxicated.[25] As it has often been termed, such "temporary insanity" does not entitle a defendant to raise an insanity defense.[26] Quite simply, intoxication is not a mental disease or defect.[27]

Yet, one may be both intoxicated and insane.[28] In such a case, the pertinent factual issue becomes the reason for the defendant's lack of capacity under the second prong of *M'Naghten* in relation to the defendant's actions. To be found criminally responsible, the defendant's lack of capacity at the

---

[24] *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018); *State v. Hotz, supra* note 21. See, *State v. Bigelow, supra* note 10; *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014); *Hill v. State*, 42 Neb. 503, 60 N.W. 916 (1894); *Schlencker v. The State*, 9 Neb. 241, 1 N.W. 857 (1879), *reversed on rehearing on other grounds* 9 Neb. 300, 2 N.W. 710.

[25] See, *State v. Hotz, supra* note 21; *Schlencker v. The State, supra* note 24. See, also, *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017). Cf. *Hopt v. People*, 104 U.S. 631, 26 L. Ed. 873 (1881); *Com. v. Herd*, 413 Mass. 834, 604 N.E.2d 1294 (1992); *Duke v. State*, 61 Tex. Crim. 441, 134 S.W. 705 (1910); *Commonwealth v. Hawkins*, 69 Mass. 463 (1855).

[26] See, *State v. Bigelow, supra* note 10; *State v. Hotz, supra* note 21.

[27] See *State v. Hotz, supra* note 21.

[28] See, *Berry v. State*, 969 N.E.2d 35 (Ind. 2012); *State v. Silvers*, 323 N.C. 646, 374 S.E.2d 858 (1989); *Harris v. State*, 250 Ga. 889, 302 S.E.2d 104 (1983).

time of the offense as to the crimes charged must be due to voluntary intoxication.[29]

[10] The law has also long recognized a wide distinction between those cases where a criminal defendant's loss of capacity results from voluntary periodic intoxication and where the condition of insanity is produced by protracted overindulgence or abuse.[30] The latter has been referred to as "settled" or "fixed" insanity.[31] Settled insanity produced by intoxication affects criminal responsibility in the same way as insanity produced by any other cause.[32] To be punishable under such circumstances, the crime must take place and be the immediate result of a fit of intoxication, and not the result of insanity occasioned by previous bad habits.[33]

---

[29] See, *State v. Hotz, supra* note 21; *Wright v. The People, supra* note 21.

[30] See, *Hill v. State, supra* note 24 (citing cases); *Regina v. Oxford*, (1840) 173 Eng. Rep. 941, 9 Car. & P. 525. See, also, *U.S. v. McGlue*, 26 F. Cas. 1093 (C.C.D. Mass. 1851); *Jones v. State*, 648 P.2d 1251 (Okla. Crim. App. 1982); *Johnson v. Commonwealth*, 135 Va. 524, 115 S.E. 673 (1923); *People v. Travers*, 88 Cal. 233, 26 P. 88 (1891); *State v. Hundley*, 46 Mo. 414 (1870); *People v. Rogers*, 18 N.Y. 9 (1858).

[31] *State v. Hotz, supra* note 21. See, *Schlencker v. The State, supra* note 24; *Wright v. The People, supra* note 21. See, also, *Parker v. State*, 7 Md. App. 167, 179, 254 A.2d 381, 388 (1969) ("the distinction . . . is not so much between temporary and permanent insanity as it is one between the direct results of drinking, which are voluntarily sought after"). See, generally, 40 C.J.S. *Homicide* § 23 at 421 (2014) ("[o]ne who was insane from the combined effect of the use of intoxicating liquors and some other cause is not criminally responsible unless the direct, immediate, and primary cause of the insanity was the use of the intoxicating liquors").

[32] *State v. Hotz, supra* note 21; *Schlencker v. The State, supra* note 24. See *State v. Williams, supra* note 25. See, also, *Com. v. Herd, supra* note 25; *Duke v. State, supra* note 25.

[33] See, *State v. Hotz, supra* note 21; *Schlencker v. The State, supra* note 24. See, also, *U.S. v. Drew*, 25 F. Cas. 913, 913-14 (C.C.D. Mass. 1828) ("[a]s he was not then intoxicated, . . . he cannot be pronounced guilty of the offence. The law looks to the immediate, and not to the remote cause; to the actual state of the party, and not to the causes, which remotely produced it").

*Effect of 2011 Neb. Laws, L.B. 100.*

We begin with discussion of legislation adopted in 2011.[34] It contained three sections: one provided for a new statute, one amended an existing statute, and the final section repealed the original of the amended statute.

The first section of the legislative act provided for a new statute addressing the criminal responsibility of intoxicated persons.[35] The new statute, codified as Neb. Rev. Stat. § 29-122 (Reissue 2016), states: "A person who is intoxicated is criminally responsible for his or her conduct. Intoxication is not a defense to any criminal offense and shall not be taken into consideration in determining the existence of a mental state that is an element of the criminal offense . . . ."

The second section of the act amended § 29-2203, the statute addressing the defense of not responsible by reason of insanity, to add a fourth subsection.[36] Section 29-2203(4) provides that "[f]or purposes of this section, insanity does not include any temporary condition that was proximately caused by the voluntary ingestion, inhalation, injection, or absorption of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof." Because L.B. 100, § 2, amended § 29-2203, the third section of the bill repealed the original section of § 29-2203.[37]

[11-13] To determine the effect of L.B. 100, we start with its language. Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.[38] An appellate court will not resort to interpretation of statutory language to ascertain the meaning of words which are plain, direct, and unambiguous.[39] In construing a statute,

---

[34] See 2011 Neb. Laws, L.B. 100.

[35] *Id*., § 1.

[36] See *id.*, § 2.

[37] See *id.*, § 3.

[38] *State v. Dailey, ante* p. 325, 990 N.W.2d 523 (2023).

[39] *State v. Godek*, 312 Neb. 1004, 981 N.W.2d 810 (2022).

the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.[40]

Reading the text of the act as a whole, we cannot definitely discern that the Legislature did not intend to change the law regarding settled insanity. While § 29-2203(4), considered in isolation, can be read consistently with settled insanity jurisprudence, we do not believe that §§ 29-122 and 29-2203(4), read together, compel a conclusion that no change was intended. In that sense, L.B. 100 was ambiguous.

[14] In order for a court to inquire into a statute's legislative history, that statute in question must be open to construction, and a statute is open to construction when its terms require interpretation or may reasonably be considered ambiguous.[41] Because we find ambiguity concerning L.B. 100, it is appropriate to consider legislative history.

We do not read the legislation to have effectuated any change in the insanity defense as it was established in this state.[42] A proponent's testimony at the committee hearing that "the goal of this legislation is to directly prevent those temporary mental illnesses that are directly or proximately caused by the drugs themselves and not some permanent, non-self-induced, directly self-induced mental illness like settled insanity that develops over time"[43] speaks most directly to that intent.

---

[40] *State v. Jedlicka*, 305 Neb. 52, 938 N.W.2d 854 (2020).

[41] *State v. McGuire*, 301 Neb. 895, 921 N.W.2d 77 (2018).

[42] Compare *State v. Hotz, supra* note 21, with Floor Debate, L.B. 100, Judiciary Committee, 102d Leg., 1st Sess. 9-12 (Mar. 15, 2011), and Judiciary Committee Hearing, L.B. 100, 102d Leg., 1st Sess. 36-38 (Jan. 21, 2011).

[43] Judiciary Committee Hearing, L.B. 100, 102d Leg., 1st Sess. 40 (Jan. 21, 2011).

Weeks before the passage of § 29-2203(4), we decided *State v. Hotz*,[44] wherein we reaffirmed our longstanding precedent that temporary insanity caused by voluntary intoxication is not a complete defense to a crime. We explained that the origin of voluntary intoxication, no matter the substance, as a self-induced impairment fundamentally distinguishes it from a mental disease or defect. "'Indeed, it is universally recognized that a condition of insanity brought about by an individual's voluntary use of alcohol or drugs will not relieve the actor of criminal responsibility for his or her acts.'"[45]

We note that § 29-2203(4) was specifically designed to address Joseph D. Hotz' attempt to raise the insanity defense at trial.[46] Hotz had consumed psilocybin mushrooms with his roommate. While intoxicated and under the influence of these drugs, Hotz murdered his roommate. At trial, Hotz attempted to raise a not responsible by reason of insanity defense, but the trial court refused to instruct the jury on the insanity defense. On appeal, we concluded that Hotz was not entitled to an insanity instruction because

> Hotz voluntarily ingested hallucinogenic mushrooms and marijuana. He had taken mushrooms in the past and had experienced anxiety and delusions. Hotz was well aware of the mind-altering effects the mushrooms might have. While Hotz may have experienced a state that was "tantamount to insanity," that state was temporary. Hotz took the mushrooms around 4 p.m. on December 5, 2008, and by late that night, he was lucid and able to respond to

---

[44] *State v. Hotz, supra* note 21.

[45] *Id.* at 277, 795 N.W.2d at 657 (quoting *State v. Sexton*, 180 Vt. 34, 44, 904 A.2d 1092, 1100 (2006) (holding defendant can be not responsible for his conduct as result of independently preexisting mental disease or defect), *overruled on other grounds, State v. Congress*, 198 Vt. 241, 114 A.3d 1128 (2014)).

[46] See, Floor Debate, 102d Leg., 1st Sess. 10-11 (Mar. 15, 2011); Judiciary Committee Hearing, 102d Leg., 1st Sess. 37-38 (Jan. 21, 2011).

questions. Hotz had no history of mental illness, and there is no evidence that he suffered permanent mental problems from his use of drugs.[47]

[15] We interpret § 29-2203(4) as a codification of our longstanding precedent, which we reaffirmed in *Hotz*, that as a matter of law, voluntary intoxication is not a mental disease or defect for the purpose of the insanity defense.[48] In enacting a statute, the Legislature is presumed to know the general condition surrounding the subject matter of the legislative enactment, and it is presumed to know and contemplate the legal effect that accompanies the language it employs to make effective the legislation.[49] As our precedent has held that the insanity defense does not include any temporary insanity caused by voluntary intoxication, § 29-2203(4) states that insanity does not include any temporary condition that was proximately caused by the voluntary use of intoxicating substances.

[16] The State's argument also overlooks that the requirement of proximate cause is more restrictive than a requirement of factual cause alone.[50] The idea of proximate cause is a flexible concept that generally refers to the basic requirement that there must be some direct relation between the result and the alleged conduct.[51] A requirement of proximate cause serves to preclude criminal responsibility in situations where the causal link between conduct and result is so attenuated that the

[47] *State v. Hotz, supra* note 21, 281 Neb. at 277, 795 N.W.2d at 657-58.

[48] See Judiciary Committee Hearing, 102d Leg., 1st Sess. 38, 40-41 (Jan. 21, 2011) (noting exceptions for involuntary intoxication and prolonged intoxication, as well as discussing lack of effect on settled insanity). See, also, Floor Debate, 102d Leg., 1st Sess. 11-12 (Mar. 15, 2011).

[49] *Bohac v. Benes Service Co.*, 310 Neb. 722, 969 N.W.2d 103 (2022).

[50] *Paroline v. United States*, 572 U.S. 434, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014).

[51] See *State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016) (citing *Paroline v. United States, supra* note 50).

consequence is more aptly described as mere fortuity.[52] It would be the end of the insanity defense if any voluntary use of intoxicating substances, no matter how attenuated, precluded a criminal defendant from being legally insane.[53]

[17] We decline to adopt the State's reading of § 29-2203(4). As we have mentioned, the enactment of § 29-2203(4) merely codified our longstanding precedent that a mental disease or defect does not include voluntary intoxication, and a defendant's loss of capacity that was immediately produced by intoxication does not excuse criminal responsibility if the accused became voluntarily intoxicated. We note that in adhering to our precedent, our conclusion is consistent with the approach recently taken by other courts.[54]

*Applied to Brennauer's Case.*

[18] We now turn back to our consideration of whether instructions Nos. 6 and 7 were plain error and whether the giving of these instructions was prejudicial or harmless. When examining for harmless error, the court may look at a variety of factors, including the jury instructions as a whole,

---

[52] See *id.*

[53] See, also, *State v. Hundley, supra* note 30.

[54] See, *Kassa v. State*, 137 Nev. 150, 485 P.3d 750 (2021) (recognizing disease or defect of mind does not include mental state caused solely by voluntary intoxication); *State v. Abion*, 148 Haw. 445, 478 P.3d 270 (2020) (holding self-induced intoxication exception only applies to acts committed while temporarily under influence of voluntarily ingested substances); *Commonwealth v. Dunphe*, 485 Mass. 871, 153 N.E.3d 1254 (2020) (holding insanity defense not foreclosed where defendant's long-term drug use caused or exacerbated mental illness or defect); *McNeil v. U.S.*, 933 A.2d 354 (D.C. 2007) (holding no evidence was presented that defendant was suffering from drug-induced mental illness at time of offense); *White v. Com.*, 272 Va. 619, 636 S.E.2d 353 (2006) (recognizing distinction of settled insanity adopted long ago); *State v. Sexton, supra* note 44 (holding defendant can be not responsible for his conduct as result of preexisting mental disease or defect). Cf. *People v. Voth*, 312 P.3d 144 (Colo. 2013). But see *Bieber v. People*, 856 P.2d 811 (Colo. 1993).

the evidence presented at trial, and the closing arguments.[55] In doing so, we review the language of the instructions in light of the State's theory of the case and our settled insanity precedent.[56]

As we have concluded, Brennauer's use of substances had no legal effect on the determination of whether he suffered from his mental disease. At trial, both experts agreed, as the record overwhelmingly shows, that Brennauer was suffering from a mental disease at the time of the charged offenses and satisfied the first prong of the insanity defense. The State adduced significant testimony concerning Brennauer's history of substance abuse. Both experts agreed that Brennauer was not intoxicated at the time of his actions. But the State's expert testified that intoxication could not be "rule[d] out entirely" as the cause of Brennauer's memory loss.

[19-21] We have long recognized that jurors are not lawyers and that instructions must not be of such a nature as to be confusing to those not trained in the law.[57] The purpose of instructions is to furnish guidance to the jury in its deliberations and to aid it in arriving at a proper verdict; and, with this end in view, the jury instructions should state clearly and concisely the issues of fact and the principles of law that are necessary to enable them to accomplish the purpose desired.[58] Accordingly, a jury instruction that misstates the issues and has a tendency to confuse the jury is erroneous.[59] That is why,

---

[55] *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019).

[56] See, *State v. Conover, supra* note 13; *State v. Goodseal, supra* note 13; *State v. Majors, supra* note 13.

[57] See, *Hutchinson v. Western Bridge & Construction Co.*, 97 Neb. 439, 150 N.W. 193 (1914); *Bloom v. State*, 95 Neb. 710, 146 N.W. 965 (1914) (Hamer, J., dissenting); *Reed v. McRill*, 41 Neb. 206, 59 N.W. 775 (1894). See, also, *State v. Phillips*, 286 Neb. 974, 840 N.W.2d 500 (2013).

[58] See, *Fulmer v. State*, 178 Neb. 20, 131 N.W.2d 657 (1964); *Lynn v. City of Omaha*, 153 Neb. 193, 43 N.W.2d 527 (1950).

[59] *State v. Garcia*, 311 Neb. 648, 974 N.W.2d 305 (2022).

on occasion, the language used in jury instructions should be adapted to the understanding of the jury to which it is directed.[60] Brennauer's case presented such an occasion.

Even assuming there was sufficient evidence in the record of Brennauer's intoxication to instruct the jury on the effect of a temporary condition caused by voluntary intoxication, we find that, given the evidence in the record of Brennauer's long-term substance use, the district court should also have instructed the jury on the concept of settled insanity. Specifically, the jury should have been instructed about the difference between a temporary condition caused by voluntary intoxication and a settled or fixed condition caused by intoxicating substances and that a defendant cannot be found insane based on the former, but could be found insane as a result of the latter. By giving the jury an instruction on a temporary condition caused by voluntary intoxication without also instructing on settled insanity, the district court's instructions did not adequately account for the full evidentiary picture.

Given the unusual facts of this case, the jury instructions created a significant danger that the jury erroneously concluded that it was precluded from finding that Brennauer was not responsible by reason of insanity solely because of Brennauer's prior drug use. Such an understanding would have fundamentally affected what evidence the jury considered, how the jury weighed the evidence, and, potentially, its verdict.[61] The danger of such a possibility prejudicially affected

---

[60] See *Yeoman v. State*, 81 Neb. 244, 115 N.W. 784 (1908), *modified on rehearing* 81 Neb. 252, 117 N.W. 997. See, also, *State v. Abram*, 284 Neb. 55, 815 N.W.2d 897 (2012); *State v. Adams, supra* note 12; *Krehnke v. Farmers Union Co-op. Assn.*, 199 Neb. 632, 260 N.W.2d 601 (1977); *Hutchinson v. Western Bridge & Construction Co., supra* note 57; *Jones v. Bates*, 26 Neb. 693, 42 N.W. 751 (1889). Cf. *Commonwealth v. Batchelder*, 407 Mass. 752, 555 N.E.2d 876 (1990); *Centurion Stone of Nebraska v. Trombino*, 19 Neb. App. 643, 812 N.W.2d 303 (2012).

[61] See *Davis v. State*, 90 Neb. 361, 133 N.W. 406 (1911).

Brennauer's substantial rights.[62] This error is plainly evident from the record and is of such a nature that leaving it uncorrected would damage the integrity, reputation, or fairness of the judicial process. Accordingly, we notice plain error and conclude that this error was not harmless and that reversal is necessitated. Hence, we vacate Brennauer's convictions and sentences.

Because our conclusion does not rest on a failure by the State to make a prima facie showing of Brennauer's guilt as sufficient evidence was adduced at trial to sustain guilty verdicts, we remand the cause for a new trial.[63] On remand, the State is not foreclosed from introducing competent evidence to support its theory that Brennauer was criminally responsible due to his voluntary intoxication. If the State does so, the district court should craft appropriate instructions in light of the evidence presented at the new trial.

Further, we note that since the time of Brennauer's trial, we have instructed trial courts to discontinue the practice of separately instructing juries on efficient intervening cause in favor of the more direct and clear instructions based on the concept of proximate or concurring cause.[64] A separate instruction is confusing to lay jurors and distracts them from the ultimate question.[65] When there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give that instruction to the jury in a criminal case.[66]

---

[62] See, also, *Com. v. Berry*, 457 Mass. 602, 931 N.E.2d 972 (2010) (holding when jury could have believed any alcohol that exacerbated defendant's mental illness would result in forfeiture of insanity defense, even if defendant's mental disease or defect caused defendant's loss of substantial capacity, was reversible error).

[63] See, *State v. Richardson*, 285 Neb. 847, 830 N.W.2d 183 (2013); *State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[64] See *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023).

[65] See *id.*

[66] *Id.*

[22] In light of our decision, the record may differ substantially on remand. Accordingly, we decline to address Brennauer's assignments of error concerning the pretrial motions. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[67]

## CONCLUSION

On account of our interpretation of § 29-2203(4) and the particular facts of this case, we notice plain error in the instructions given to the jury and conclude that such error was not harmless. We, therefore, reverse the district court's judgment, vacate Brennauer's convictions and sentences, and remand the cause for a new trial.

JUDGMENT REVERSED, CONVICTIONS AND
SENTENCES VACATED, AND CAUSE
REMANDED FOR A NEW TRIAL.

---

[67] *State v. Yzeta*, 313 Neb. 202, 983 N.W.2d 124 (2023).

HEAVICAN, C.J., concurring.

I agree with and join the opinion of the court. When read in the context of our jurisprudence, § 29-2203(4) is simply a codification of our long-settled precedent. And in light of the theory of the State's case, the jury instructions as given had a tendency to confuse and mislead the jury, which amounted to plain error. I write separately to express my reservation regarding the absence of a jury instruction regarding the issue of Brennauer's potential voluntary intoxication.

In our order for supplemental briefing, the parties were directed to submit briefs addressing the applicable burden of proof with respect to the issues of voluntary intoxication and proximate cause, and whether the failure to instruct the jury as to which party bore the applicable burden of proof with respect to the issues of voluntary intoxication, proximate cause, or both constituted plain error that necessitated

reversal. I recognize that in light of the plain error in the jury instructions regarding settled insanity, a determination is not necessary to resolve Brennauer's appeal. Hence, I decline to opine on whether the State should bear the burden to prove beyond a reasonable doubt that Brennauer was criminally responsible due to his voluntary intoxication or whether Brennauer should bear the burden to disprove his voluntary intoxication as part of proving his insanity defense by a preponderance of the evidence.

Nonetheless, in my view, the failure to provide the jury with any instruction on the burden of proof was misleading and did not adequately cover the issues such that it was a prejudicial error that necessitated reversal. If the State contends on remand that any lack of capacity Brennauer experienced in relation to his actions, which would otherwise satisfy the second prong of the insanity defense, was a result of his voluntary intoxication such that he is criminally responsible, it is my opinion that the jury should receive instruction on the applicable burden of proof.

Miller-Lerman, J., joins in this concurrence.